# MONTANA ET AL. *v.* UNITED STATES

No. 77–1134.   Argued December 4, 1978—Decided February 22, 1979

MARSHALL, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, BLACKMUN, POWELL, REHNQUIST, and STEVENS, JJ., joined. REHNQUIST, J., filed a concurring statement, *post,* p. 164. WHITE, J., filed a dissenting opinion, *post,* p. 164.

*Robert A. Poore,* Special Assistant Attorney General of Montana, argued the cause for appellants. With him on the brief were *Terry B. Cosgrove,* Special Assistant Attorney General, and *Robert W. Corcoran.*

*Stuart A. Smith* argued the cause for the United States. With him on the brief were *Solicitor General McCree, Assistant Attorney General Ferguson,* and *David English Carmack.**

---

*Briefs of *amici curiae* urging reversal were filed by *Louis J. Lefkowitz,*

Mr. Justice Marshall delivered the opinion of the Court.

The State of Montana imposes a one percent gross receipts tax upon contractors of public, but not private, construction

Attorney General, *Ruth Kessler Toch,* Solicitor General, and *Francis V. Dow,* Assistant Attorney General, for the State of New York; by *Slade Gorton,* Attorney General, *Richard H. Holmquist,* Senior Assistant Attorney General, and *Greg Montgomery,* Assistant Attorney General, for the State of Washington; and by the Attorneys General and other officials for their respective jurisdictions as follows: *J. Marshall Coleman,* Attorney General of Virginia, and *John G. MacConnell,* Assistant Attorney General; *John A. Lasota,* Acting Attorney General of Arizona, and *Ian A. MacPherson,* Assistant Attorney General; *Allen I. Olson,* Attorney General of North Dakota, and *Kenneth Jakes,* Special Assistant Attorney General; *Avrum M. Gross,* Attorney General of Alaska, and *Joseph K. Donohue,* Assistant Attorney General; *Paul L. Douglas,* Attorney General of Nebraska, and *Ralph H. Gillan,* Assistant Attorney General; *Frank B. Burch,* Attorney General of Maryland, and *Gerald Langbaum,* Assistant Attorney General; *Ronald Y. Amemiya,* Attorney General of Hawaii, and *T. Bruce Honda,* Deputy Attorney General; *Robert List,* Attorney General of Nevada, and *James H. Thompson,* Chief Deputy Attorney General; *James A. Redden,* Attorney General of Oregon; *William J. Baxley,* Attorney General of Alabama, and *Herbert I. Burson, Jr.; John J. Rooney,* Acting Attorney General of Wyoming, and *James D. Douglass,* Senior Assistant Attorney General; *Philip H. Jacobsen,* Acting Attorney General of Guam; *Slade Gorton,* Attorney General of Washington, and *Richard H. Holmquist,* Senior Assistant Attorney General; *Bill Clinton,* Attorney General of Arkansas, and *Martin J. Nevrla,* Assistant Attorney General; *Robert L. Shevin,* Attorney General of Florida, and *Maxie Broome,* Assistant Attorney General; *Chauncey H. Browning, Jr.,* Attorney General of West Virginia, and *Thomas J. Steele, Jr.,* Assistant Attorney General; *Richard C. Turner,* Attorney General of Iowa, and *George Murray,* Assistant Attorney General; *Wayne L. Kidwell,* Attorney General of Idaho, and *Theodore V. Spangler, Jr.; Toney Anaya,* Attorney General of New Mexico, and *Jan Unna,* Assistant Attorney General; *Theodore L. Sendak,* Attorney General of Indiana, and *Donald Bogard; Miguel Gimenez-Munoz,* Attorney General of Puerto Rico, and *Victor Cruz Ojeda; Frank J. Kelley,* Attorney General of Michigan; and *J. D. MacFarlane,* Attorney General of Colorado, and *Steven Kaplan,* Assistant Attorney General.

projects. Mont. Rev. Codes Ann. § 84–3505 (Supp. 1977).[1] A public contractor may credit against the gross receipts tax its payments of personal property, corporate income, and individual income taxes.[2] Any remaining gross receipts liability is customarily passed on in the form of increased construction costs to the governmental unit financing the project.[3] At issue in this appeal is whether a prior judgment by the Montana Supreme Court upholding the tax precludes the United States from contesting its constitutionality and if

[1] Section 84–3505 (5), Mont. Rev. Codes Ann. (Supp. 1977), provides in part:

"each public contractor shall pay to the state an additional license fee in a sum equal to one per cent (1%) of the gross receipts from public contracts during the income year for which the license is issued . . . ."

The Act defines public contractors to include:

"(1) . . . any person who submits a proposal to or enters into a contract for performing all public construction work in the state with the federal government, state of Montana, or with any board, commission, or department thereof or with any board of county commissioners or with any city or town council . . . or with any other public board, body, commission, or agency authorized to let or award contracts for any public work when the contract cost, value, or price thereof exceeds the sum of $1,000.

"(2) . . . subcontractors undertaking to perform the work covered by the original contract or any part thereof, the contract cost, value, or price of which exceeds the sum of $1,000." § 84–3501 (Supp. 1977).

Gross receipts encompass:

"all receipts from sources within the state, whether in the form of money, credits, or other valuable consideration, received from, engaging in, or conducting a business, without deduction on account of the cost of the property sold, the cost of the materials used, labor or service cost, interest paid, taxes, losses, or any other expense whatsoever. However, 'gross receipts' shall not include cash discounts allowed and taken on sales and sales refunds, either in cash or by credit, uncollectible accounts written off from time to time, or payments received in final liquidation of accounts included in the gross receipts of any previous return made by the person." § 84–3501 (3).

[2] See §§ 84–3513 and 84–3514 (Supp. 1977).

[3] See App. 98–108, 112–117, 164.

not, whether the tax discriminates against the Federal Government in violation of the Supremacy Clause.

## I

In 1971, Peter Kiewit Sons' Co., the contractor on a federal dam project in Montana, brought suit in state court contending that the Montana gross receipts tax unconstitutionally discriminated against the United States and the companies with which it dealt. The litigation was directed and financed by the United States. Less than a month after the state suit was filed, the Government initiated this challenge to the constitutionality of the tax in the United States District Court for the District of Montana. On stipulation by the parties, the instant case was continued pending resolution of the state-court litigation.

That litigation concluded in a unanimous decision by the Montana Supreme Court sustaining the tax. *Peter Kiewit Sons' Co.* v. *State Board of Equalization,* 161 Mont. 140, 505 P. 2d 102 (1973) (*Kiewit I*). The court found the distinction between public and private contractors consistent with the mandates of the Supremacy and Equal Protection Clauses. *Id.,* at 149–154, 505 P. 2d, at 108–110. The contractor subsequently filed a notice of appeal to this Court, but abandoned its request for review at the direction of the Solicitor General. App. to Juris. Statement 86–87. It then instituted a second action in state court seeking a refund for certain tax payments different from those involved in *Kiewit I.* On determining that the contractor's second legal claim was, in all material respects, identical to its first, the Montana Supreme Court invoked the doctrines of collateral estoppel and res judicata to affirm the dismissal of the complaint. *Peter Kiewit Sons' Co.* v. *Department of Revenue,* 166 Mont. 260, 531 P. 2d 1327 (1975) (*Kiewit II*).

After the decision in *Kiewit II,* a three-judge District Court heard the instant case on the merits. In a divided opinion, the court concluded that the United States was not bound

by the *Kiewit I* decision, and struck down the tax as violative of the Supremacy Clause. 437 F. Supp. 354 (1977). The majority began with the premise that the Supremacy Clause immunizes the Federal Government not only from direct taxation by the States, but also from indirect taxation that operates to discriminate against the Government or those with whom it transacts business. *Id.*, at 359. See *United States* v. *Detroit,* 355 U. S. 466, 473 (1958) ; *Phillips Chemical Co.* v. *Dumas Independent School Dist.,* 361 U. S. 376, 387 (1960). Because no private contractors were subject to the Montana gross receipts tax, the court reasoned that the statute impermissibly singled out the Federal Government and those with whom it dealt for disparate treatment. That the tax applied to state and municipal as well as federal contractors did not, in the majority's view, negate the statute's discriminatory character. For although contractors on state projects might pass on the amount of their tax liability to the State in the form of higher construction costs, Montana would recoup its additional expenditure through the revenue that the tax generated. By contrast, when federal contractors shifted the burden of their increased costs to the United States, it would receive no such offsetting revenues. Accordingly, the court concluded that the statute encroached upon the immunity from discriminatory taxation enjoyed by the Federal Government under the Supremacy Clause. 437 F. Supp., at 358–359. One judge argued in dissent both that the United States was estopped from challenging the constitutionality of the tax and that the statutory scheme, because it encompassed receipts of municipal and state as well as federal contractors, was not discriminatory within the meaning of *Phillips Chemical Co.* v. *Dumas Independent School Dist., supra.* 437 F. Supp., at 365–366 (Kilkenny, J., dissenting).

We noted probable jurisdiction. 436 U. S. 916 (1978). Because we find that the constitutional question presented by

this appeal was determined adversely to the United States in a prior state proceeding, we reverse on grounds of collateral estoppel without reaching the merits.

## II

A fundamental precept of common-law adjudication, embodied in the related doctrines of collateral estoppel and res judicata, is that a "right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction . . . cannot be disputed in a subsequent suit between the same parties or their privies . . . ." *Southern Pacific R. Co.* v. *United States,* 168 U. S. 1, 48–49 (1897). Under res judicata, a final judgment on the merits bars further claims by parties or their privies based on the same cause of action. *Cromwell* v. *County of Sac,* 94 U. S. 351, 352 (1877); *Lawlor* v. *National Screen Service Corp.,* 349 U. S. 322, 326 (1955); 1B J. Moore, Federal Practice ¶ 0.405 [1], pp. 621–624 (2d ed. 1974) (hereinafter 1B Moore); Restatement (Second) of Judgments § 47 (Tent. Draft No. 1, Mar. 28, 1973) (merger); *id.,* § 48 (bar). Under collateral estoppel, once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation. *Parklane Hosiery Co.* v. *Shore,* 439 U. S. 322, 326 n. 5 (1979); Scott, Collateral Estoppel by Judgment, 56 Harv. L. Rev. 1, 2–3 (1942); Restatement (Second) of Judgments § 68 (Tent. Draft No. 4, Apr. 15, 1977) (issue preclusion). Application of both doctrines is central to the purpose for which civil courts have been established, the conclusive resolution of disputes within their jurisdictions. *Southern Pacific R. Co., supra,* at 49; *Hart Steel Co.* v. *Railroad Supply Co.,* 244 U. S. 294, 299 (1917). To preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources,

and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions.[4]

These interests are similarly implicated when nonparties assume control over litigation in which they have a direct financial or proprietary interest and then seek to redetermine issues previously resolved.[5] As this Court observed in *Soufront* v. *Compagnie des Sucreries*, 217 U. S. 475, 486–487 (1910), the persons for whose benefit and at whose direction a cause of action is litigated cannot be said to be "strangers to the cause. . . . [O]ne who prosecutes or defends a suit in the name of another to establish and protect his own right, or who assists in the prosecution or defense of an action in aid of some interest of his own . . . is as much bound . . . as he would be if he had been a party to the record." See *Schnell* v. *Peter Eckrich & Sons, Inc.*, 365 U. S. 260, 262 n. 4 (1961); cf. *Zenith Radio Corp.* v. *Hazeltine Research, Inc.*, 395 U. S. 100, 111 (1969). Preclusion of such nonparties falls under the rubric of collateral estoppel rather than res judicata because the latter doctrine presupposes identity between causes of action. And the cause of action which a nonparty has vicariously asserted differs by definition from that which he subsequently seeks to litigate in his own right. See *G. & C. Merriam Co.* v. *Saalfield*, 241 U. S. 22, 29 (1916); Restatement (Second) of Judgments § 83, Comment *b*, p. 51 (Tent. Draft

---

[4] See Hazard, Res Nova in Res Judicata, 44 S. Cal. L. Rev. 1036, 1042–1043 (1971); Vestal, Preclusion/Res Judicata Variables: Adjudicating Bodies, 54 Geo. L. J. 857, 858 (1966); Note, Developments in the Law—Res Judicata, 65 Harv. L. Rev. 818, 820 (1952).

[5] Although the term "privies" has been used on occasion to denominate nonparties who control litigation, see, *e. g., G. & C. Merriam Co.* v. *Saalfield*, 241 U. S. 22, 27 (1916); Restatement of Judgments § 83, Comment *a* (1942), this usage has been criticized as conclusory and analytically unsound. 1B Moore ¶ 0.411 [6], p. 1553; cf. Note, 65 Harv. L. Rev., at 856. The nomenclature has been abandoned in the applicable section of the Second Edition of the Restatement. See Restatement (Second) of Judgments § 83 (Tent. Draft No. 2, Apr. 15, 1975).

No. 2, Apr. 15, 1975); 1B Moore ¶ 0.411 [6], pp. 1553–1554; Note, Developments in the Law—Res Judicata, 65 Harv. L. Rev. 818, 862 (1952).

That the United States exercised control over the *Kiewit I* litigation is not in dispute. The Government has stipulated that it:

(1) required the *Kiewit I* lawsuit to be filed;

(2) reviewed and approved the complaint;

(3) paid the attorneys' fees and costs;

(4) directed the appeal from State District Court to the Montana Supreme Court;

(5) appeared and submitted a brief as *amicus* in the Montana Supreme Court;

(6) directed the filing of a notice of appeal to this Court; and

(7) effectuated Kiewit's abandonment of that appeal on advice of the Solicitor General. App. to Juris. Statement 86–87.

Thus, although not a party, the United States plainly had a sufficient "laboring oar" in the conduct of the state-court litigation to actuate principles of estoppel. *Drummond* v. *United States*, 324 U. S. 316, 318 (1945). See *Schnell* v. *Peter Eckrich & Sons, Inc.*, *supra*, at 262 n. 4; *Souffront* v. *Compagnie des Sucreries*, *supra*, at 486–487; *Watts* v. *Swiss Bank Corp.*, 27 N. Y. 2d 270, 277–278, 265 N. E. 2d 739, 743–744 (1970).

### III

To determine the appropriate application of collateral estoppel in the instant case necessitates three further inquiries: first, whether the issues presented by this litigation are in substance the same as those resolved against the United States in *Kiewit I;* second, whether controlling facts or legal principles have changed significantly since the state-court judgment; and finally, whether other special circumstances warrant an exception to the normal rules of preclusion.

### A

A review of the record in *Kiewit I* dispels any doubt that the plaintiff there raised and the Montana Supreme Court there decided the precise constitutional claim that the United States advances here. In its complaint in *Kiewit I,* the contractor alleged that the gross receipts tax and accompanying regulations were unconstitutional because they, *inter alia:*

"(a) illegally discriminate against the Plaintiff, the United States, and its agencies and instrumentalities, and those with whom the United States does business, and deny them due process of law and the equal protection of the laws;

"(b) illegally impose a tax on Plaintiff which is not uniform upon the same class of subjects;

"(c) illegally and improperly interfere with the Federal Government's power to select contractors and schedule construction and . . . conflict with Federal law and policy regulating Federal procurement;

"(d) illegally violate the immunity of the Federal Government and its instruments (including Plaintiff) from state control in the performance of their functions; [and]

.      .      .      .      .

"(f) illegally frustrate the Federal policy of selecting the lowest possible bidder . . . ." App. 37.

The Montana Court rejected those contentions on the theory that:

"The federal government is being treated in the same manner as the state of Montana treats itself and its subdivisions or municipalities. The only discrimination the federal government can claim is that private contractors are not paying the same tax as public contractors. However, according to [*Phillips Chemical Co.* v. *Dumas School Dist.*, 361 U. S. 376 (1960), and *Moses Lake*

*Homes* v. *Grant County,* 365 U. S. 744 (1961),] . . . all [that is] required is that the state does not give itself special treatment over that received by the federal government. The Act involved here treats the federal government in the same manner as it treats those who deal with any part of the state government." *Kiewit I,* 161 Mont., at 152, 505 P. 2d, at 109.

No different constitutional challenge is at issue in this litigation. Indeed, the United States' amended complaint tracks almost verbatim the language of the plaintiff's in *Kiewit I* in alleging that the Montana tax provisions:

> "(1) illegally discriminate against the plaintiff, United States, and its agencies and instrumentalities, and those with whom the United States does business in violation of the Supremacy Clause, Article VI, Clause 2, and the Fourteenth Amendment;

> "(2) illegally impose a tax on plaintiff's contractors and subcontractors which is not uniform upon the same class of subjects in violation of the Fourteenth Amendment;

> "(3) illegally force the United States of America to pay more for its construction than does a private party or corporation in violation of the Supremacy Clause, Art. VI, Cl. 2; [and]

> .     .     .     .     .

> "(5) . . . illegally interfer[e] with the Federal Government's free choice to choose its contractors and frustrat[e] the policy of choosing the lowest bidder in violation of federal procurement law and the Supremacy Clause, Art. IV [*sic*], Cl. 2." App. 67.

Thus, the "question expressly and definitely presented in this suit is the same as that definitely and actually litigated and adjudged" adversely to the Government in state court. *United States* v. *Moser,* 266 U. S. 236, 242 (1924). Absent significant changes in controlling facts or legal principles

since *Kiewit I,* or other special circumstances, the Montana Supreme Court's resolution of these issues is conclusive here.

## B

Relying on *Commissioner* v. *Sunnen,* 333 U. S. 591 (1948), the United States argues that collateral estoppel extends only to contexts in which "the controlling facts and applicable legal rules remain unchanged. *Id.,* at 600. In the Government's view, factual stasis is missing here because the contract at issue in *Kiewit I* contained a critical provision which the contracts involved in the instant litigation do not.

Under its contract with the Army Corps of Engineers, Kiewit was unable to take advantage of the credit provisions of the gross receipts tax.[6] In 1971, however, the United States altered its policy and has since required Montana contractors to seek all available refunds and credits. See 437 F. Supp., at 358; App. 91. As the Government reads the *Kiewit I* decision, the Montana Supreme Court proceeded on the assumption that if Kiewit had been able to avail itself of the offsetting income and property tax credits, there might have been a "total washout" of its gross receipts tax liability. 161 Mont., at 145, 505 P. 2d, at 106. Thus, according to the Government, the holding of *Kiewit I* was that the Montana statute did not discriminate against the United States under circumstances where, but for the Federal Government's own contractual arrangement, the tax might have had no financial impact. Brief for United States 35–36. Because the uncontroverted evidence in this case establishes that after taking

---

[6] Clause 58 of the contract enumerated the credit provisions of the Montana statute and provided that "[t]he Contractor, and, in turn, the subcontractors will not take advantage of these credits." *Peter Kiewit Sons' Co.* v. *State Board of Equalization,* 161 Mont. 140, 145–146, 505 P. 2d 102, 106 (1973) *(Kiewit I).*

The record does not reflect the reason for the Government's policy. See Tr. of Oral Arg. 35.

all credits available, federal contractors are still subject to a gross revenue tax of one-half of one percent, App. to Juris. Statement 90, the Government submits that the factual premise of the *Kiewit I* holding is absent here.

We disagree.[7] It is, of course, true that changes in facts essential to a judgment will render collateral estoppel inapplicable in a subsequent action raising the same issues. See, *e. g., United States v. Certain Land at Irving Place & 16th Street,* 415 F. 2d 265, 269 (CA2 1969); *Metcalf v. Commissioner,* 343 F. 2d 66, 67–68 (CA1 1965); *Alexander v. Commissioner,* 224 F. 2d 788, 792–793 (CA5 1955); 1B Moore ¶ 0.448, pp. 4232–4233, ¶ 0.422 [4], pp. 3412–3413. But we do not construe the opinion in *Kiewit I* as predicated on the factual assumption that the gross receipts tax would cancel out if public contractors took all available refunds and credits.

The Montana Supreme Court adverted to the washout possibility when discussing the origin of the gross receipts tax as a revenue-enforcing rather than revenue-generating measure. Prior to the enactment of the statute, certain public contractors had evaded assessment of local property taxes by shifting equipment from one construction site to another, and by filing corporate or personal income tax returns that did not fairly reflect the amount of profit attributable to construction projects within the State. 161 Mont., at 143–145, 505 P. 2d,

---

[7] A threshold difficulty with the Government's argument is that the record does not support its assertion that contractual provisions barring contractors from taking credits are "no longer applicable in the contracts involved in this litigation." Brief for United States 14. See also Tr. of Oral Arg. 37. The Montana gross receipts statute was enacted in 1967, and the Government has not limited its request for relief to gross receipts taxes paid after 1971 when the contractual provisions involved in *Kiewit I* were discontinued. See *supra,* at 158. To the contrary, the Government's amended complaint in the instant case seeks a refund of all tax payments, less credits, made under the Montana statute. App. 68–69. Thus, the Government's contention concerning factual changes does not justify the District Court's refusal to invoke estoppel with respect to the pre-1971 claims.

at 104–105.[8]   In establishing a flat percentage tax on gross receipts, with credits available for income and property tax payments, the Montana Legislature sought to remove any incentive for contractors to dissemble about the location of taxable equipment and the source of taxable revenues.   Under the statutory scheme, a contractor who paid a substantial amount of property or income taxes might, by claiming those payments as credits, effectively cancel out his gross receipts tax liability.   *Id.*, at 145, 505 P. 2d, at 105.   In practice, the court noted in *Kiewit I*, the statute had not resulted in a total offset of the 1% gross receipts payments, in part because of provisions such as those in federal contracts.   *Ibid.*, 505 P. 2d, at 106.   Significantly, however, the court did not rely on the potential absence of tax liability in its analysis of Kiewit's constitutional challenge.   Indeed, it did not even allude to the washout potential in the course of that discussion.   *Id.*, at 147–154, 505 P. 2d, at 106–110.   It focused rather on the rationality of the classification between public and private contractors, and on the parity of treatment between the United States and other public contractors.   *Ibid.*

Our conclusion that the washout potential of the tax was not of controlling significance in *Kiewit I* is further reinforced by the Montana Supreme Court's holding in *Kiewit II*. There, the contractor alleged that its gross receipts tax liability had exceeded its property and income tax credits, and argued that "the only basis" for the decision in *Kiewit I* was that "if the Act were properly enforced it would result in a 'washout.' "   *Kiewit II*, 166 Mont., at 262, 531 P. 2d, at 1328. The Montana Supreme Court rejected that reading of *Kiewit I* as "much too narro[w]."   166 Mont., at 263, 531 P. 2d, at 1329.   That the offset possibility had not materialized for Kiewit was, in the court's view, a fact too "inconsequential" to warrant relitigation of the statute's constitutionality.   *Id.*,

---

[8] Apparently the problem had not arisen to any appreciable extent with private contractors.   Tr. of Oral Arg. 5–6.

at 264, 531 P. 2d, at 1329. So too here, we cannot view the absence of a total washout as altering facts essential to the judgment in *Kiewit I*.

Thus, unless there have been major changes in the law governing intergovernmental tax immunity since *Kiewit I*, the Government's reliance on *Commissioner* v. *Sunnen*, 333 U. S. 591 (1948), is misplaced. *Sunnen* involved the tax status of certain income generated by a license agreement during a particular tax period. Although previous litigation had settled the status of income from the same agreement during earlier tax years, the Court declined to give collateral estoppel effect to the prior judgment because there had been a significant "change in the legal climate." *Id.*, at 606. Underlying the *Sunnen* decision was a concern that modifications in "controlling legal principles," *id.*, at 599, could render a previous determination inconsistent with prevailing doctrine, and that

> "[i]f such a determination is then perpetuated each succeeding year as to the taxpayer involved in the original litigation, he is accorded a tax treatment different from that given to other taxpayers of the same class. As a result, there are inequalities in the administration of the revenue laws, discriminatory distinctions in tax liability, and a fertile basis for litigious confusion. [Collateral estoppel] is not meant to create vested rights in decisions that have become obsolete or erroneous with time, thereby causing inequities among taxpayers." *Ibid.* (citations omitted).

No such considerations obtain here. The Government does not contend and the District Court did not find that a change in controlling legal principles had occurred between *Kiewit I* and the instant suit. That the Government's amended complaint in this action replicates in substance the legal argument advanced by the contractor's complaint in *Kiewit I* further

suggests the absence of any major doctrinal shifts since the Montana Supreme Court's decision.[9]

Because the factual and legal context in which the issues of this case arise has not materially altered since *Kiewit I*, normal rules of preclusion should operate to relieve the parties of "redundant litigation [over] the identical question of the statute's application to the taxpayer's status." *Tait* v. *Western Maryland R. Co.*, 289 U. S. 620, 624 (1933). See *United States* v. *Russel Mfg. Co.*, 349 F. 2d 13, 18–19 (CA2 1965).

## C

The sole remaining question is whether the particular circumstances of this case justify an exception to general principles of estoppel. Of possible relevance is the exception which obtains for "unmixed questions of law" in successive actions involving substantially unrelated claims. *United States* v. *Moser*, 266 U. S. 236, 242 (1924). As we recognized in *Moser:*

> "Where, for example, a court in deciding a case has enunciated a rule of law, the parties in a subsequent action *upon a different demand* are not estopped from insisting that the law is otherwise, merely because the parties are the same in both cases. But a *fact, question* or *right* distinctly adjudged in the original action cannot be disputed in a subsequent action, even though the determination was reached upon an erroneous view or by an erroneous application of the law." *Ibid.* (emphasis added).

Thus, when issues of law arise in successive actions involving unrelated subject matter, preclusion may be inappropriate. See Restatement (Second) of Judgments § 68.1, Reporter's Note, pp. 43–44 (Tent. Draft No. 4, Apr. 15, 1977); 1B Moore ¶ 0.448, p. 4235; Scott, 56 Harv. L. Rev., at 10. This excep-

---

[9] See *supra,* at 156–157.

tion is of particular importance in constitutional adjudication. Unreflective invocation of collateral estoppel against parties with an ongoing interest in constitutional issues could freeze doctrine in areas of the law where responsiveness to changing patterns of conduct or social mores is critical. To be sure, the scope of the *Moser* exception may be difficult to delineate, particularly where there is partial congruence in the subject matter of successive disputes. But the instant case poses no such conceptual difficulties. Rather, as the preceding discussion indicates, the legal "demands" of this litigation are closely aligned in time and subject matter to those in *Kiewit I*.

Nor does this case implicate the right of a litigant who has "properly invoked the jurisdiction of a Federal District Court to consider federal constitutional claims," and who is then "compelled, without his consent . . . , to accept a state court's determination of those claims." *England* v. *Medical Examiners,* 375 U. S. 411, 415 (1964) (footnote omitted). As we held in *England,* abstention doctrine may not serve as a vehicle for depriving individuals of an otherwise cognizable right to have federal courts make factual determinations essential to the resolution of federal questions. *Id.,* at 417. See *NAACP* v. *Button,* 371 U. S. 415, 427 (1963). However, here, as in *England,* a party has "freely and without reservation submit[ted] his federal claims for decision by the state courts . . . and ha[d] them decided there . . . ." *England* v. *Medical Examiners, supra,* at 419.[10] Considerations of comity as well as repose militate against redetermination of issues in a federal forum at the behest of a plaintiff who has chosen to litigate them in state court.

Finally, the Government has not alleged unfairness or inadequacy in the state procedures to which it voluntarily

---

[10] The Government seeks to distinguish *England* on the ground that the court below did not technically abstain, but rather, at the parties' request, continued the action "pending the resolution in the state courts of Montana." App. to Juris. Statement 49–50. Further, in the Government's view, the rule of *England* arises only when a *party* freely submits his federal claims

submitted.[11]   We must conclude therefore that it had a full and fair opportunity to press its constitutional challenges in *Kiewit I*.   Accordingly, the Government is estopped from seeking a contrary resolution of those issues here.

The judgment of the District Court is

*Reversed.*

MR. JUSTICE REHNQUIST, concurring.

I join the Court's opinion on the customary understanding that its references to law review articles and drafts or finally adopted versions of the Restatement of Judgments are not intended to bind the Court to the views expressed therein on issues not presented by the facts of this case.

MR. JUSTICE WHITE, dissenting.

I disagree that the Government was estopped from litigating its claim in federal court by virtue of the earlier action in the courts of Montana.   And on the merits I think the Montana gross receipts tax is constitutionally infirm.   Thus, I would affirm the decision below.

---

to adjudication in state courts.  Because the United States was not a party in *Kiewit I*, the Government submits that it is not bound by the judgment in that case.  Brief for United States 34.

We agree that the District Court's action is properly characterized as a continuance and that res judicata, the doctrine involved in *England*, is inapplicable to nonparties.  See *supra*, at 154–155.  But neither point is availing here since we dispose of the case on grounds of collateral estoppel, which does apply to nonparties, see *ibid.*, and invoke *England* simply to dispel any inference that the same result would obtain if the Federal Government had been forced into state court and had reserved its federal claim.

[11] Redetermination of issues is warranted if there is reason to doubt the quality, extensiveness, or fairness of procedures followed in prior litigation. See Restatement (Second) of Judgments § 68.1 (c) (Tent. Draft No. 4, Apr. 15, 1977); Note, The Preclusive Effect of State Judgements on Subsequent 1983 Actions, 78 Colum. L. Rev. 610, 640–653 (1978).  Cf. *Gibson* v. *Berryhill*, 411 U. S. 564 (1973); *Trainor* v. *Hernandez*, 431 U. S. 434, 469–470, and n. 15 (1977) (STEVENS, J., dissenting).

## I

It is basic that the principle of collateral estoppel "must be confined to situations where the matter raised in the second suit is identical in all respects with that decided in the first proceeding and where the controlling facts . . . remain unchanged." *Commissioner* v. *Sunnen,* 333 U. S. 591, 599–600 (1948). The Court does not dispute this, but maintains that discrepancies in the facts underlying the state and federal actions were of no moment. It is clear, however, that the Montana Supreme Court assumed in *Kiewit I* that the tax under scrutiny was a tax-enforcing, rather than a revenue-collecting, measure. The significance of that supposition, in my view, is refuted neither by the opinion in *Kiewit I* nor by the state court's subsequent pronouncements in *Kiewit II.* That the assumption lost its force by the time of the federal litigation is undisputed. By then the Federal Government had abandoned its policy of requiring contractors with whom it dealt to forgo credits available under the gross receipts law. Though federal contractors accordingly availed themselves of the credits and refunds allowable under the law, "the uncontroverted evidence in this case establishes that . . . federal contractors are still subject to a [net] gross revenue tax of one-half of one percent." *Ante,* at 158–159. Because the facts developed before the three-judge court cast the constitutional issues in a wholly different light, I think the court properly proceeded to decide those issues uninhibited by the prior state adjudication.

At the outset of its discussion in *Kiewit I,* the Montana Supreme Court labored to demonstrate that the gross receipts tax in issue was a tax-enforcing measure, in that funds collected pursuant thereto would be applied, or credited, against taxes otherwise due. The court understood that the tax had not in practice resulted in a total washout of gross receipts payments, but it attributed this to the Federal Government's policy prohibiting certain contractors—such as the Kiewit Co.

itself—from taking refunds and credits available under the law, and to ignorance of, and indifference to, the credit provisions on the part of other contractors. The court maintained that, aside from such aberrations, the Act was intended to and would "operate as a *revenue enforcing* measure." *Peter Kiewit Sons' Co.* v. *State Board of Equalization,* 161 Mont. 140, 146, 505 P. 2d 102, 106 (1973) (emphasis added).

The majority surmises that the state court's extensive characterization of the tax was irrelevant to the court's constitutional analysis. But that view relegates to dicta the state court's careful appraisal of the operation and impact of the tax. By inspecting the state court's constitutional analysis independently of that court's evaluation of the nature of the tax, the majority assumes that the constitutional adjudication proceeded *in vacuo*. The logic of the state court's decision may well extend to a revenue-raising measure. But to say that *Kiewit I* may be persuasive authority on that score is not to establish that it has adjudicated the issue.

Moreover, the Court's reliance on *Kiewit II* to demonstrate the immateriality of the "washout" nature of the tax to the decision in *Kiewit I* is misplaced. I recognize that the Montana Supreme Court regarded Kiewit's second attack—launched after the contractual credit restrictions were removed by the Government—as foreclosed by the judgment in the first suit. But in addressing Kiewit's objection to the application of the tax in a manner to raise revenue, the court acknowledged that "it may be that Kiewit would be entitled to a refund or some other administrative remedy." *Peter Kiewit Sons' Co.* v. *Department of Revenue,* 166 Mont. 260, 262, 531 P. 2d 1327, 1328 (1975). The statute, of course, contemplates no such remedy, nor did the court affirmatively construe it to authorize one.[1] Yet the court's remark leaves

---

[1] The Administrator of the Miscellaneous Tax Division of the Montana Department of Revenue testified in the federal proceedings that no administrative remedy existed and that none was contemplated. Deposition of James Madison, Record Doc. No. 68, p. 16.

unclear whether, absent such a remedy, the court would persist in holding the tax constitutional. The statement underscores the court's assumption in *Kiewit I* that the gross receipts tax was a tax-enforcing device and suggests correlatively that the decision there did not condone imposition of an unmitigated positive tax solely on public contractors.[2] The majority is unsound in inferring from *Kiewit II* that the ruling in *Kiewit I* was insensitive to the then-presumed "washout" character of the gross receipts tax.

As I see it, then, there was a "modification of the significant facts" that rendered the prior state "determination obsolete . . . at least for future purposes," *Commissioner* v. *Sunnen, supra,* at 599; and the Government was free to litigate its constitutional challenge in federal court.

## II

On the merits, the judgment below should be sustained. There is nothing wrong, of course, with a state gross receipts tax of general applicability that incidentally applies to contractors who deal with the Federal Government thus increasing its construction costs. *United States* v. *County of Fresno,* 429 U. S. 452, 460 (1977); *James* v. *Dravo Contracting Co.,* 302 U. S. 134, 160 (1937). "So long as the tax is not directly laid on the Federal Government, it is valid if nondiscriminatory . . . or until Congress declares otherwise." *United States* v. *County of Fresno, supra,* at 460.

In *Fresno,* we stressed the requirement that the state tax be "imposed equally on the other similarly situated constituents of the State." 429 U. S., at 462. Such concern for discrim-

---

[2] It is true that the court indicated that its first opinion held that there were reasonable grounds for distinguishing between private and public contractors for tax purposes. But the discussion differentiating private and public contractors to which the court alluded was addressed to Kiewit's equal protection claim, not its supremacy claim. See *Peter Kiewit Sons' Co.* v. *State Board of Equalization,* 161 Mont. 140, 146–151, 505 P. 2d 102, 106–109 (1973).

inatory taxation "returns to the original intent of *M'Culloch* v. *Maryland*[, 4 Wheat. 316 (1819)]." *Id.*, at 462–463. We observed that "[t]he political check against abuse of the taxing power found lacking in *M'Culloch* . . . is present where the State imposes a nondiscriminatory tax only on its constituents or their artificially owned entities; and *M'Culloch* foresaw the unfairness in forcing a State to exempt private individuals with beneficial interests in federal property from taxes imposed on similar interests held by others in private property." *Ibid.*

The Montana gross receipts tax cannot survive application of the foregoing principles. It is not a law generally embracing all similarly situated state constituents doing business in the private and public sectors. While mandating collection of revenue from contractors who transact with public entities, the law passes over all contractors who deal with private parties. Thus, the "political check" that would have been provided by private-sector contractors "against abuse of the taxing power [is] lacking." *Ibid.*

Appellants maintain that contractors who deal with private enterprises are not situated similarly to those who transact with public bodies. They point to special problems associated with enforcement of state tax laws against contractors prone to move about the State in pursuit of large public contracts. The gross receipts tax measure was necessary, it is argued, in order to facilitate enforcement of other tax laws against such contractors. Concededly, however, the same problems exist with respect to large private contractors; and even assuming that differentiation between public-sector and private-sector contractors is warranted in the context of tax enforcement measures, appellants' representations provide no basis for discriminating in regard to revenue raising.

The Montana Supreme Court in the *Kiewit* litigation defended the classification for equal protection purposes by submitting that the public's stake in the safety of building

projects, and hence in the qualifications of public contractors, warranted treating public-sector contractors differently from their private-sector counterparts. But these considerations, like the matters advanced by appellants, fail to explain why a tax is collected from the former but not the latter.[3] Moreover, though the law may be sustainable against an equal protection assault, the indulgent standard used in that area will not be applied when federal supremacy is threatened. See *Phillips Chemical Co.* v. *Dumas Independent School Dist.*, 361 U. S. 376, 383–385 (1960). In such circumstances, disparate treatment "must be justified by *significant* differences between the two classes"; there must be "considerations provid[ing] solid support for the classification." *Id.*, at 383–384 (emphasis added). It seems plain, then, that private-sector and public-sector contractors are similarly situated for purposes of this litigation.

III

Appellants contend, nonetheless, that it is enough that the tax reaches contractors dealing with all *public* entities—state or federal. Appellants root their contention in this Court's statement in *Phillips Chemical Co.* v. *Dumas Independent School Dist., supra,* at 385, that a State must "treat those who deal with the Government as well as it treats those *with whom it deals itself.*" (Emphasis added.) But *Phillips* furnishes no support for appellants' position. There, the Court held unconstitutional a state tax scheme that treated lessees

---

[3] The court suggested that public contractors warrant special tax treatment because public construction projects are more extensively regulated than private jobs and are subject to mandatory supervision or inspection. But the State has stipulated that no "federal contracts [are] subject to state standards, review or supervision, nor [does the State] have any right or authority to suspend any federal contractor's license, nor can the [State] interfere with selection of bidders for the Federal Government." App. to Juris. Statement 79. Thus, the considerations posited by the state court do not distinguish private-sector contractors from those who deal with the Federal Government.

of federal property more severely than lessees of state property. Even before addressing that issue, however, the Court ascertained that there was "no discrimination between the Government's lessees and lessees of private property." 361 U. S., at 381. Thus, the Court in *Phillips* evinced concern for equal treatment of all similarly situated persons connected with both the private and public sector, not just of persons within the public sector.

In any event, I see no basis whatsoever for extracting from the principle that a State may not favor itself over the Federal Government the further proposition that a State may favor its private-sector constituents so long as contractors working for public bodies are taxed. Indeed, in *Fresno* the Court sustained the tax only after assuring itself that persons who rented federal property were "no worse off under California tax laws than those who work for private employers and rent houses in the private sector." 429 U. S., at 465. Such laws, reaching broadly across the public and private sectors, are characteristic of those this Court has sustained. *E. g., United States* v. *Detroit,* 355 U. S. 466 (1958); *Detroit* v. *Murray Corp.,* 355 U. S. 489 (1958); *Alabama* v. *King & Boozer,* 314 U. S. 1 (1941); *James* v. *Dravo Contracting Co.,* 302 U. S. 134 (1937); *Silas Mason Co.* v. *Tax Comm'n,* 302 U. S. 186 (1937).

There is good reason to insist that a state tax be "imposed equally" on all "similarly situated constituents of the State," *United States* v. *County of Fresno,* 429 U. S., at 462, whether connected with the public sector or private. Broad application of a tax is necessary to guarantee an efficacious "political check" on potentially abusive taxation. The Montana gross receipts tax, limited as it is to public-sector contractors, provides little such assurance. Taxation of contractors dealing directly with the State or state agencies affords no safeguard against discriminatory treatment of federal contracting agencies and the contractors with whom they deal. Any tax

increase passed along by a contractor would be borne fully by a federal agency but would be offset by the corresponding tax revenues in the case of the State; from the State's perspective the tax is a washout.

Municipalities and local districts, it is true, do not enjoy the same advantage, and they may resist tax increases that would, if successfully enforced, burden them and the Federal Government alike. But, at least potentially, local subdivisions may secure offsetting state assistance by indirection,[4] and that may diminish their incentive to oppose tax hikes. Even assuming, however, that local public bodies share an interest with the Federal Government in restraining taxes, it escapes me why the Government must acquiesce in the limited protection they provide when an enhanced political check would ensue from extension of the tax to other similarly situated state constituents. As I have indicated, there is no support for such a notion in the decisions of this Court. *McCulloch*, itself, condoned state taxation of private interests in federal property "in common with other property of the same description *throughout the State.*" *McCulloch* v. *Maryland,* 4 Wheat. 316, 436 (1819) (emphasis added). And in *Fresno* we observed that escalation of a state tax so as to destroy or impair a federal function might be forestalled by imposition of the tax "on the income and property interests of all other residents and voters of the State." 429 U. S., at 463 n. 11. These decisions counsel against nice determinations regarding the political leverage of this group or that and establish the simple but fundamental proposition that the Federal Government is entitled to the full measure of protection

---

[4] Montana has authorized payment of state funds to local political entities in certain contexts. *E. g.,* Mont. Rev. Codes Ann. §§ 50–1802 to 50–1810 (Supp. 1977) (funding for certain highway improvements and expansion of services due to coal development); § 11–1834 (Supp. 1977) (state payments to municipalities with police departments); § 11–1919 (Supp. 1977) (state payments to municipalities with fire department relief associations).

derivable from inclusion of all similarly situated state constituents in the class subject to the tax.

Appellants suggested at oral argument that private-sector contracting comprises a relatively small percentage of all contracting in the State and argue that exclusion of private-sector contractors from the ambit of the gross receipts tax is therefore excusable. But appellants do not seriously contend that private-sector contracting in Montana is *de minimis,* nor would any such assertion find support in the record.[5] Private contracting parties, if subjected to this tax, would provide significant additional protection against abuse of the state taxing power. Exempting the private sector from the Montana gross receipts tax was accordingly contrary to the Constitution.

As I believe the three-judge court properly reached and decided the merits of the Government's claim, I dissent from reversal of the judgment below.

---

[5] The record indicates, if anything, that private-sector contracting is nonnegligible. See App. 108–109, 166–167, 179, 183. See also Bureau of the Census, 1972 Census of Construction Industries 39–2, 39–4, 39–7 (1975).