W.O. and Eliza NARRAMORE, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 92–375 L.

United States Court of Federal Claims.

Feb. 1, 1994.

Richard A. Black, Phoenix, AZ, for plaintiffs.

Glen R. Goodsell, Dept. of Justice, Washington, DC, for defendant.

## OPINION

WIESE, Judge.

### INTRODUCTION

This is an action to recover just compensation under the Fifth Amendment for the alleged informal taking of an additional property interest in lands over which the Government had earlier acquired a flowage easement through formal condemnation.

Plaintiffs are landowners whose property lies upstream of the Painted Rock Dam on the Gila River in Arizona. The dam was constructed by the U.S. Army Corps of Engineers in 1959 for the "control of flood in downstream overflow areas along the Gila River area in Arizona, along the lower Colorado River Valley in Arizona and California, and for other uses incident thereto." *United States v. 4,566.26 Acres of Land, More or Less*, Civ. No. 3164 PHX, trial tr. at 1239 (Dist.Ariz. filed Oct. 13, 1959) (trial transcript of formal condemnation action). The flow of water through the dam is controlled by gates installed at the level of the streambed—approximately 530 feet above mean sea level (msl). The top of the spillway is at 661 msl. Plaintiffs' lands lie chiefly between elevations 580 and 610 msl.

Because operation of the dam necessarily meant that flood waters would overflow the river channel above it and thus inundate low-lying farmlands upstream from the dam, the Corps sought flowage easements, by formal condemnation, over the properties involved. Plaintiffs' property was one of a number of such properties for which flowage easements were sought. The notice of condemnation described the easement as a "perpetual right, power, privilege and easement occasionally to overflow and submerge said lands and all structures and improvements thereon." *Id.*, trial tr. at 1240.

The Government's calculations as to the value of the flowage easement (*i.e.*, the decrease in land value wrought by the easement) were based, as they had to be, on the frequency and severity of expected floods; the storage capacity of upstream reservoirs; and, of course, the rate at which water would be released from the dam. The release rate was of particular importance because it determined the length of time the water could be expected to remain on the burdened land.

To develop predicted flooding frequencies, the Corps relied upon historical data. That

is, it was assumed that the rainfall patterns recorded over the 66 year period between 1888 and 1954 would generally repeat themselves in the years following completion of the dam. Thus, lands lying below 580 msl were expected to be covered by floodwaters at least once every 5 years. In accordance with internal policy, the Corps condemned these lands in fee. For lands lying at higher elevations, however, where the frequency of inundation would be less, the Corps sought flowage easements.

The schedule of expected releases from the dam that was made available to the appraisers at the time of the condemnation action is known as Schedule A (or "Plan A"). Under Schedule A, the rate of release was tied to the height of the flood waters being held behind the dam. Discharge rates were to range from 2,500 cubic feet per second (cfs) when the water was at low elevations, to 22,500 cfs when the water reached 640 msl and above.

Because of constraints on downstream channel capacity, however, this anticipated release schedule was never actually followed. According to plaintiffs, the Corps considered other release schedules but ultimately decided to abandon the idea of adhering to any fixed release plan. The Government's failure to adhere to Schedule A, and the prolongation of periodic inundation attributable to that failure, forms the crux of this action for an additional taking.

## FACTS AND PROCEDURAL HISTORY

At the 1963 condemnation trial, both the Government and the Narramores (then in the posture of defendants) relied on expert testimony as to the before and after values of the land. Much of the trial testimony focused on issues such as comparable sales; little emphasis was placed on the release plan. Nevertheless, plaintiffs now assert that all appraisal estimates presented to the jury were based on the assumption that flood waters would be released from the dam in accordance with Schedule A discharge rates.

To clarify this point, plaintiffs offer the affidavit of Leonard Halpenny, a hydrologist who served as a Government expert witness at the condemnation proceeding. Halpenny states:

[I]t is impossible to compute filling frequencies or flood routing studies through a reservoir behind a dam unless a fixed plan of releases from the dam is used.

All of the expert testimony [at the Narramore condemnation trial] was based upon filling frequencies and routing studies prepared by the Army Corps of Engineers which used Plan A as the fixed operational discharge of the Painted Rock Dam. This was a tacit, underlying assumption of all experts, be they hydrologists, appraisers or otherwise.

.     .     .     .     .

... [P]rior to 1966 it was not considered by anyone that Plan A discharge would cause any problems downstream. In fact it was assumed that the downstream channel would be able to handle Plan A discharges and that this would be the manner of operation of the dam.

At trial, the Government's experts stated that the gates in Painted Rock Dam would remain open during floods, allowing water to pass through at the prescribed rate. During cross-examination, counsel for the Narramores attempted to elicit testimony undercutting the reliability of this assertion. The following exchange occurred between the Narramores' counsel and Albert Gildea, a Corps hydrologist:

Q:  ... Now, wouldn't you say as a matter of fact in the sensible operation of this Painted Rock Dam that at times you would stop the flow of water when there was general rain below the Painted Rock Dam and on the Colorado River that might flood?

.     .     .     .     .

A: Yes. The answer to your direct question is yes, it is the purpose of the dam to protect any damage, if it is possible to protect such damage on the lower river, by storing at Painted Rock Dam. However, we have made considerable studies to show that it is extremely unlikely to have a great flood on the Gila River upstream from Painted Rock Dam and simultaneously a great flood on the Colo-

rado River, so that we could not release our flow through Painted Rock Dam in the prescribed manner.

Civ. No. 3164 PHX, trial tr. at 597–98.

A more detailed explanation of the region's flooding patterns was provided by Leonard Halpenny, who testified for the Government as follows:

The areas downstream from Painted Rock Dam are low mountain areas, not high, mostly desert. The type of floods we get from that type of country are summer floods. The big floods from that type of area are summer floods.

The big floods in central Arizona are winter floods, and the reason they are big is that a warm rain comes on top of the snow, and there is a great volume to those floods, and those are the great-volume floods which fill the lake. The ones that might originate on the Gila downstream might have temporary high peaks but no volume. They would be out of the way before water from the lake behind the dam would affect them.

Q: Then if there were floods downstream from Painted Rock Dam, that would call for keeping the Painted Rock Dam closed until those—

A: No, I don't think so.

Q: You would just add to the big flood, would you?

A: No, sir. I would think it would be out of the way before the Painted Rock water got down there. They wouldn't mix.

*Id.,* trial tr. at 769. Plainly, then, the Government's experts denied that the gates would be shut under any but the most extraordinary of circumstances.

One of the Narramores' engineering experts, Samuel Turner, offered a different conclusion about the feasibility of keeping the gates open:

I made a thorough study of the floods noted by the Army Engineers and used in their study, and it is my opinion that in 18 of the floods they used—I believe it is 38 or 36, something like that—there is a probability that the gates would have had to have been closed part of the time; and in 9 it is almost a certainty that the gates would have had to have been closed part of the time because of downstream floods or floods from other areas on the Colorado River below controlled dams.

*Id.,* trial tr. at 1128–29. Hence, according to Turner, downstream flooding was a real rather than a hypothetical danger.

In closing argument, Government counsel re-emphasized the point that the Corps had sought to make throughout the trial: that the dam "does not shut off the flow inasmuch as the lower gates are open at all times letting regular underflow and small floods pass right through." Then he added: "The defendants have dwelt at great length on the possibilities of a catastrophic nature rather than realistic probabilities as they have been testified to by the experts...." *Id.,* trial tr. at 1209–10.

Counsel for the Narramores presented a different picture of the dam's operation, contending that "the Government is not obliged to let any water out of that dam at any time." *Id.,* trial tr. at 1175. In the course of his closing argument, counsel focused on a particular passage in the instructions the court would be giving to the jury, which read as follows:

In determining the loss caused the defendants by the imposition of the perpetual easement for the inundation and flooding upon the defendants' lands, the jury must assume that the Government will make full use of the easement it has taken in this action. You must assume also that the use of the easement by the United States will be in a manner as injurious to the defendants' remaining rights as the easement rights taken by the Government will lawfully permit.

*Id.,* trial tr. at 1248. Counsel interpreted this passage as meaning that the easement must be valued with the understanding that the Government could open or shut the gates at its pleasure, that is, without any adherence to a prescribed release schedule.

The jury returned a verdict that gave the Narramores more than the Government appraiser had recommended but less than the amount suggested by the Narramores' own expert. Subsequently, the United States filed a motion for a new trial, stating that the

instruction quoted above was "clearly an invasion of the province of the jury." The motion was denied.

When, in the years following the condemnation action, the Corps failed to adhere to Schedule A, the Narramores pursued a variety of remedies to redress what they saw as an impermissible broadening of the easement. After the first major flood, in 1966, the Narramores sought to compel releases in accordance with Schedule A; however, their motion for a preliminary injunction was denied on the ground of sovereign immunity. The next major flood occurred in 1973; the Narramores then brought an action under the Federal Tort Claims Act, 28 U.S.C. § 1346(b) (1988). Again, they were unsuccessful. The district court dismissed the action, and the Ninth Circuit affirmed, on the basis that the United States is immune from tort liability for flood damage caused by the operation of a dam designed for the control of floodwaters. *Pierce v. United States*, 650 F.2d 202 (9th Cir.1981) (citing 33 U.S.C. 702c).

Between 1978 and 1980, flooding was a frequent event. As a result, in November of 1980, the Narramores once again filed an action in the district court. This action consisted of five separate claims: an action to quiet title; a motion for a declaratory judgment; a claim of mutual mistake; an action in trespass; and a claim that the United States had violated plaintiffs' civil rights. The district court granted the United States' motion for summary judgment, and the Narramores pursued the first three claims on appeal. The Ninth Circuit reversed and remanded due to the existence of several genuine issues of fact regarding these claims. *Narramore v. United States*, 852 F.2d 485 (9th Cir.1988).

On remand, plaintiffs filed a motion under Fed.R.Civ.P. 60(b) to reopen the judgment in the original condemnation action. The district court granted this motion. Subsequently, defendant (the United States) moved to transfer the case to the United States Court of Federal Claims on the ground that the district court lacked jurisdiction; defendant based this motion on the argument that plaintiffs were, in essence, claiming an additional taking. The district court denied the motion to transfer.

Following this denial, defendant appealed to the Federal Circuit, which ruled as follows: "When a property owner seeks compensation for a taking beyond the scope of the Government's condemnation action, the proper remedy is the Tucker Act [28 U.S.C. § 1491]; thus, when damages exceed $10,000, the proper forum is the Claims Court [now the United States Court of Federal Claims]." *Narramore v. United States*, 960 F.2d 1048, 1051 (Fed.Cir.1992). On this basis, the Federal Circuit vacated the district court's order to reopen the judgment and ordered the case to be transferred to the Court of Federal Claims.

The case is now before this court on defendant's motion for summary judgment. Oral argument was heard on January 13, 1994.

## DISCUSSION

■ Defendant contends that this action for an additional taking is barred by claim preclusion, or, in the alternative, by issue preclusion. Under the doctrine of claim preclusion, or res judicata, "a final judgment on the merits bars further claims by parties or their privies based on the same cause of action." *Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979). The doctrine of issue preclusion, or collateral estoppel, mandates that "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." *Id.* We examine each of these doctrines separately as applied to the situation before us.

## I. CLAIM PRECLUSION

■ A claim is essentially an event-based concept. The Restatement (Second) of Judgments assigns a transactional meaning to the term "claim." *See* Restatement ch. 3, topic 2, title d, introductory note (1980). Thus, a claim may be defined as "an aggregate of facts which in various combinations, all comprising a common core or nucleus of the facts, may support a number of substantive

legal theories with corresponding remedies." *Id.* § 24 reporter's note, cmt. c.

■ Hence, the question before us is whether plaintiffs' allegation of an additional taking is based on an essentially new transaction or event. Relying on the above-quoted definition of the term "claim," we ask whether the crucial fact in plaintiffs' case—the Government's failure to adhere to Schedule A—was, at the time of the condemnation trial, part of the "common core or nucleus" of facts upon which the award of compensation was based. If not—and if the failure to follow Schedule A is of sufficient significance as to give rise to a new set of "core" facts—then plaintiffs' claim is not precluded.

Defendant's position is that plaintiffs have failed to present a new claim. This position is implicitly grounded in the assumption that the failure to follow Schedule A is not of sufficient significance to give rise to a new "common core or nucleus of the facts." In this connection, defendant notes that the broad language of the flowage easement, as stated in the notice of condemnation, does not require adherence to a particular release schedule. Hence, defendant asserts, the Government has authority under the existing easement to release water from the dam in whatever fashion it deems appropriate. From defendant's perspective, then, the abandonment of Schedule A is not a transformative event but rather an insignificant change in use that falls well within the scope of potential uses for which plaintiffs have already been compensated.

■ In support of its position, defendant states: "The extent of the flowage easement was not an issue for the jury to decide." This statement is true as far as it goes. However, an easement that is broadly worded may require further explanation or definition. For this reason, evidence presented to a jury may be used to flesh out the vague language of an easement. *See United States v. 1,014.16 Acres of Land, More or Less,* 739 F.2d 1371, 1372 (8th Cir.1984) ("Although it is impermissible for the government to increase or decrease the extent of the taking described, it is not impermissible for the government to introduce evidence to make more definite the interest acquired by the

complaints and declarations.") (quoting lower court opinion, 558 F.Supp. 1238, 1241 (W.D.Mo.1983)).

The easement we are concerned with, an easement "occasionally to overflow and submerge" plaintiffs' lands, is not self-defining. Without context, those words are simply too vague and imprecise to offer any basis upon which to bottom a determination of value. Thus, in seeking to determine the scope of the easement acquired by the United States, one must consider the evidence heard by the jury. The easement is shaped and limited by testimony on such matters as flooding patterns and planned releases.

And here—to repeat—the valuation testimony that the jury was asked to consider was heavily weighted in favor of a use of the dam that was tied to releases in accordance with Schedule A. A constant departure from Schedule A, as the regular mode of dam operation, was not a use that any witness ever presented to the jury—not even the Narramores' experts. For this reason, defendant errs in contending that the Government's use of a release plan materially different from that presented at trial would fall within the scope of the existing easement. The broad language of the easement does not preclude plaintiffs from claiming an additional taking.

## II. ISSUE PRECLUSION

Defendant asserts issue preclusion as an alternative defense. The term "issue" has been defined as "a single, certain and material point arising out of the allegations and contentions of the parties." *Overseas Motors, Inc. v. Import Motors Ltd.,* 375 F.Supp. 499, 518 n. 66a (E.D.Mich.1974), *aff'd,* 519 F.2d 119 (6th Cir.1975), *cert. denied,* 423 U.S. 987, 96 S.Ct. 395, 46 L.Ed.2d 304 (1975) (quoted in 18 Charles A. Wright *et al., Federal Practice and Procedure* § 4417 (1981)).

■ An issue will be precluded from further litigation between the same parties only when it is the identical issue as that presented in the prior case; the issue was actually litigated in the prior case; there was a full and fair opportunity for litigation of the issue; the issue was actually decided; that

decision was necessary to the earlier judgment; the judgment was a final and valid judgment on the merits; and considerations of fairness do not dictate an exception. *See* 18 Charles A. Wright *et al.*, *Federal Practice and Procedure* § 4416.

Two of defendant's arguments are best addressed under the rubric of issue preclusion. First, defendant points to the testimony given by the Narramores' experts during the original condemnation trial to the effect that all lands lying below 620 msl would become useless within 20 years after dam operation had begun. Because of this testimony, defendant argues, plaintiffs cannot now claim an additional loss of economic value for these same lands. Second, defendant contends that plaintiffs, in raising the issue of additional damage caused by the Government's abandonment of Schedule A, are improperly seeking to relitigate the issue of the decrease in value of their lands occasioned by the Government's flowage easement.

### A. Additional loss of economic value

■ Defendant states correctly that the Narramores presented evidence at the original condemnation trial to the effect that the easement would render all lands lying below elevation 620—including their own lands—unusable within 20 years. Defendant argues that the very introduction of such evidence before the jury now precludes any further recovery for the Government's use of plaintiffs' land.

■ The issue of whether lands lying under 620 msl would be rendered useless within 20 years was indeed actually litigated before the jury. Mere introduction of evidence, however, does not in and of itself preclude further litigation of a disputed fact. As we have noted, issue preclusion requires not only that a matter actually have been litigated, but also that it have been actually and necessarily decided. If it is impossible to tell in whose favor an issue was decided, then no preclusive effect can result.

Here, we have no basis for concluding that the jury accepted the testimony of the Narramores' experts. The United States put on sharply contrasting testimony, asserting that the Narramore lands would remain useable indefinitely. Thus, the jury was free to base its award on a scenario that included viable economic use persisting beyond twenty years. We do not know whether the jury chose one theory over the other, or whether—as seems most likely—it chose to compromise.

Our difficulty in reading meaning into the jury award is to a large degree a result of the complexity of the decision. The land's remaining economic life was only one contested factor bearing on the compensation award. There was, in addition, considerable dispute at trial as to what the land had been worth before the imposition of the easement, as well as disagreement as to how severe damage from the "occasional flooding" was likely to be. (Neither party disputed that the land would have some remaining value.)

The jury was instructed to arrive at an award by deciding the "before" and "after" values of the land in question. The difference in value was to be the amount of compensation. The jury returned a verdict listing specific figures for the before and after values; these figures were significantly higher than the Government's figures but significantly lower than the Narramores'. Thus, the resulting compensation award was more than the Government wished to give but less than the Narramores wished to receive.

In view of the several variables involved in the calculations—the value of the land before the easement was taken, the effect of the easement on land values, and the land's remaining useful life—our ability to analyze a verdict such as this is severely limited. Thus, we cannot ascertain whether the jury adopted the contention that the lands would become valueless within 20 years as a premise for its award. As a result, we do not know whether plaintiffs have in fact been compensated for a permanent loss, after 20 years, of lands lying below 620 msl. This uncertainty dictates that plaintiffs now be allowed to go forward with proof demonstrating an additional taking. In short, because defendant cannot demonstrate that the matter was actually and necessarily decided in

favor of full compensation, issue preclusion cannot be asserted as a defense.

## B. The Release Rate

■ Defendant further asserts that the issue of damage to plaintiffs' land and the resulting drop in property value caused by the easement is common to the 1963 condemnation action and plaintiffs' current taking claim. According to defendant, this issue was decided at the condemnation trial and cannot now be relitigated. More particularly, defendant argues that the issue of deviation from Schedule A was fully considered at the earlier trial and thus is now subject to preclusion.

It is true that, in the condemnation trial, the Narramores' counsel did attempt to convince the jury that the Government was under no legal obligation to release water from the dam according to a set schedule. Without doubt, some of the testimony that was given buttressed this argument. The most supportive testimony on this point was that of the Narramores' engineer, Samuel Turner, who predicted significant variance from Schedule A due to the danger of adding to downstream flooding if waters were released. It should be noted, however, that not a single witness at the condemnation trial presented a scenario in which the release schedule would be completely and formally abandoned.[1] We perceive a qualitative difference between periodic forced deviation from a fixed plan and total abandonment of that plan.

Furthermore, the effectiveness of the Narramores' argument of unrestricted use was severely constrained by the information then available. That is to say, the Government's opposing argument concerning the manner in which the dam would be operated was firmly grounded in facts—or what, at that time, appeared to be facts. In contrast, the Narramores' argument was purely legal, grounded solely in the broad language of the easement. The argument dealt with possibilities—how the dam *could* be operated—as opposed to apparent realities—how the Government said the dam *would* be operated.

Thus, in terms of prevailing before the jury, the Narramores were at a significant disadvantage.

Much of the unfairness we perceive in this situation arises from the Government's dual status as party to the litigation and as dam operator. As noted, any testimony offered by the Narramores' witnesses on the subject of dam operation was purely conjectural. The Narramores could claim no authority in this matter. The Governments' witnesses, by contrast, had merely to state that the gates would be opened and shut according to plan. Their statements were backed by both the authority of ownership and the certainty that inheres in operational control. Thus, the Narramores' opportunity for "full and fair" litigation was severely limited: they were seeking compensation for a projected diminution in land value based on a method of dam operation that the Government, the actual operator, steadfastly insisted was an extreme possibility and one not likely to occur.

Examining the question of "full and fair" litigation further, we find the fact that the rate of release was a circumstance under the Government's control to be particularly important in deciding this case. We certainly do not believe that the Government engaged in any intentional misrepresentation with regard to its plans to retain water in the reservoir. Nevertheless, by asserting near-absolute adherence to a particular release plan that was never actually implemented, the Government did promote what can best be termed an innocent deception.

Due to this inherent imbalance in the probative force of the parties' arguments and the limited information available at the time of the condemnation trial, the jury had no opportunity to weigh rationally the deleterious effects of a governmental failure to adhere to Schedule A. First, because it could not foresee the problems that lay ahead, the jury could not accurately assess how often deviations from the planned release plan might occur. Second, the jury had no basis

---

1. Statements by the Narramores' counsel in closing argument suggesting that the government would close the dam gates at will, in a capricious manner, are unsupported by any evidence introduced at the trial.

for assigning specific dollar amounts to the additional damage caused by a prolonged inundation (*i.e.*, an inundation brought on by a failure to follow the planned release schedule), because the only figures before it were those presupposing Schedule A releases.[2]

In view of these very practical difficulties, it is doubtful that the trial judge's instruction to the jury had any impact on the amount of compensation awarded. The naked words of the instruction could not surmount the realities of the trial. This was a trial in which compensation was determined in relation to a planned use of the easement, taking into account the region's weather patterns and other pertinent characteristics. Neither the jury instruction nor the arguments of counsel could transform the trial from a contest about the loss in value relatable to an actual intended use into a contest about the loss of land value relatable to the broadest possible conjectural use.

Hence, we do not believe that the issues relating to lost property value in the two actions are identical. Similarly, we cannot say that in the first action the Narramores had an opportunity to fully and fairly litigate the issue of the damage caused by noncompliance with Schedule A. Therefore, this issue is not precluded from litigation in the instant case.

### CONCLUSION

The abandonment of Schedule A does not fall within the scope of the existing easement; thus, a claim based on this abandonment clearly qualifies as a "new claim." Furthermore, it has not been shown that the Narramores received full compensation for their land at the original condemnation trial; it follows that a subsequent decrease in value, *i.e.*, a further taking, cannot be ruled out. Finally, the issue of deviation from the release schedule did not receive a full airing at the condemnation trial and thus is not barred from consideration at this time.

We find that plaintiffs are not precluded from bringing a claim for an additional taking. Accordingly, defendant's motion for summary judgment is denied.

---

**2.** As Leonard Halpenny, the Government's expert witness at the condemnation trial noted in his affidavit, "it is impossible to compute filling frequencies or flood routing studies through a reservoir behind a dam unless a fixed plan of releases from the dam is used." If experts cannot measure the effects of floodwaters absent a fixed release plan, it is hardly plausible that a jury could do so.