Andrew WILSON, Plaintiff,

v.

CITY OF CHICAGO, Richard Brzeczek, Jon Burge, Patrick O'Hara, Thomas McKenna, and John Yucaitis, Defendants.

No. 86 C 2360.

United States District Court, N.D. Illinois, E.D.

Feb. 24, 1989.

See also, 710 F.Supp. 1170.

a good introduction to the case (although things have changed a bit) in *Wilson v. City of Chicago*, 684 F.Supp. 982, 983–84 (N.D.Ill.1988).

### Individual Liability of Brzeczek

The first motion is from Richard Brzeczek, who contends that he is entitled in his individual capacity to summary judgment under Rule 56, Fed.R.Civ.P., for those claims which Andrew Wilson states in Count 3 of this First Amended Complaint. The court in *Rascon v. Hardiman*, 803 F.2d 269, 273 (7th Cir.1983), held that a person can be held liable in his individual capacity under 42 U.S.C. § 1983 (1982) only if that person caused or participated in an alleged constitutional deprivation. Wilson contends that Brzeczek caused or participated in two such deprivations, one an unconstitutionally prolonged detention and the other the subjection of Wilson to unconstitutionally excessive force. Brzeczek responds that Wilson has introduced no evidence indicating that there is a genuine issue over whether Brzeczek was involved in the latter deprivation.[1]

When ruling on a motion for summary judgment, this court must take all factual inferences against the moving party and in favor of the opposing party. *Adickes v. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970). Taking the pleadings, depositions, answers to interrogatories, and affidavits on file in the light most favorable to Wilson, this court finds that there is a genuine issue as to whether Brzeczek tolerated, caused or condoned the activities Wilson alleges were unconstitutional. While Wilson has put forth little evidence of Brzeczek's involvement prior to Wilson's arrest, Wilson has evidence that once Brzeczek was told about Wilson's beating, Brzeczek did little other than write a letter to the State's Attorney indicating he would not begin an official inquiry until later. A reasonable jury could infer from Brzeczek's subsequent inactivity and the notoriety of the officers' alleged activities that Brzeczek was covering up his officers' il-

John L. Stainthorp, People's Law Office, Chicago, Ill., for plaintiff.

James P. McCarthy, Asst. Corp. Counsel, Law Dept., William J. Kunkle, Jr., Phelan, Pope & John, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

The parties to this civil rights action have filed numerous motions in advance of trial. The court will forego a general description of the facts of this case, as it has provided

1. Brzeczek joins the City in his only objection to Wilson's claims of constitutional injury stem-

ming from his detention. The court will address this argument below.

legal acts, which permits a further reasonable inference that Brzeczek condoned or encouraged this conduct. This latter activity, if proved, would meet *Rascon*'s standard of affirmative causation. For this reason, this court denies Brzeczek's motion for summary judgment on Wilson's claims that Brzeczek was individually liable.

*Official Policy Claims*

■ Brzeczek joins the City of Chicago in contending that they are entitled to summary judgment on Wilson's claims of official liability in Count 3. They first submit that Wilson cannot hold them liable for Wilson's allegedly prolonged detention under § 1983. A person may recover under § 1983 only for injuries resulting from deprivations of federal constitutional and statutory rights. See 42 U.S.C. § 1983; *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 693, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978). The fact that a municipality has a policy that leads to unconstitutional conduct is irrelevant unless the person can show that he or she is personally aggrieved by it. See *Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S.Ct. 1571, 1573, 89 L.Ed.2d 806 (1986).

Wilson contends that his twenty-four-hour detention following his arrest, prior to his appearance before a judicial officer, violated three of his rights. Wilson first claims that his detention deprived him of his right under the Sixth and Fourteenth Amendments to be informed of the charges against him. The scope of an arrestee's Sixth Amendment right to be informed of the charges against him is unclear, as most courts that have discussed this right have focused on the sufficiency of the indictment or formal charge. See, for example, *Russell v. United States*, 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962); *Hamling v. United States*, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974). Those cases that have discussed the right have dealt with it either in a brief fashion, see *Damm v. Sparkman*, 609 F.Supp. 749, 755 (D.Kan.

1985), or in a situation where the period between arrest and arraignment was short, see *O'Hagan v. Soto*, 523 F.Supp. 625, 628–29 (S.D.N.Y.1981). The notice requirements of the Sixth Amendment, like the other rights provided in the Amendment, are designed to enable a criminal defendant to present a full defense. See *Faretta v. California*, 422 U.S. 806, 818, 95 S.Ct. 2525, 2533, 45 L.Ed.2d 562 (1975) ("In short, the Amendment constitutionalizes the right to an adversary criminal trial to make a defense as we know it.").

■ Wilson does not indicate how the delay in bringing him before a judicial officer infringed on those interests which the notice provision of the Sixth Amendment protects. It is undisputed that police officers informed Wilson why he was arrested. While this alone does not satisfy the Sixth Amendment's notice provisions, it is also undisputed that Wilson later received formal notice. In opposing the City and Brzeczek's motion on this point, Wilson suggests that because of the delay in receiving this notice, he was unable to get the assistance of counsel or keep from incriminating himself. As will become clear below, however, the absence of notice hardly caused these alleged injuries—if anything, the deficient notice was only coincident with these injuries. As Wilson can point to no other constitutional injury resulting from the delay in receiving full notice, he may not pursue his action for recovery for injuries stemming from lack of full notice prior to his arraignment.[2]

■ Wilson next contends that the detention resulted in deprivation of his Sixth and Fourteenth Amendment rights to counsel. The City and Brzeczek argue that Wilson is collaterally estopped from pressing this argument in this case, however, as the Illinois Supreme Court decided that issue in *People v. Wilson*, 116 Ill.2d 29, 106 Ill.Dec. 771, 506 N.E.2d 571 (1987). The parties do not dispute that *Wilson* could prevent relitigation of certain issues in this case. See *Allen v. McCurry*, 449 U.S. 90,

---

**2.** Wilson contends further that the lack of notice violated Illinois law. Unless the actions alleged to violate state law also abridge a federal constitutional or statutory right, a person cannot recover for violations of state law under § 1983.

105, 101 S.Ct. 411, 420, 66 L.Ed.2d 308 (1980). Whether *Wilson* prevents relitigation of Wilson's claim of a denial of his right to counsel depends on Illinois' law of collateral estoppel. See *Haring v. Prosise*, 462 U.S. 306, 313–14, 103 S.Ct. 2368, 2373–74, 76 L.Ed.2d 595 (1983) (collateral estoppel effect of state court judgment is determined by rendering state's law).

Under Illinois law, a party is estopped from litigating issues decided in a previous case

> when [that] party or someone in privity with [that] party participates in two separate and consecutive cases arising on different causes of action and some controlling fact or question material to the determination of both causes has been adjudicated against that party in the former suit by a court of competent jurisdiction.

*Housing Authority v. YMCA*, 101 Ill.2d 246, 252, 78 Ill.Dec. 125, 128, 461 N.E.2d 959, 962 (1984). Wilson was certainly a party to *Wilson*, and this case certainly presents a different cause of action from that in *Wilson*. The question of whether the People of the State of Illinois denied Wilson his right to counsel by detaining him for twenty-four hours was a controlling question in *Wilson*, and was material to the Illinois Supreme Court's determination in that case. See *Wilson*, 116 Ill.2d at 49–51, 106 Ill.Dec. 771, 506 N.E.2d 571. The parties do not dispute that the trial court and the Illinois Supreme Court were courts of competent jurisdiction.

The City and Brzeczek thus demonstrate initially that *Wilson*'s determination of Wilson's Sixth Amendment claims estops Wilson from relitigating those claims here. The City and Brzeczek must meet one additional requirement, however—one that stems from the Constitution. The party against whom collateral estoppel is asserted must have had a "full and fair opportunity" to litigate the issue in the prior case. See *Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979). As will be seen below, Wilson will assert that *Wilson* collaterally estops other defendants on other issues in this case.

This suggests that Wilson believes he had a full and fair opportunity to litigate those issues before the Illinois Supreme Court. No one has suggested that his efforts on those issues differ from those he expended on the right to counsel question, and thus this court will estop him from relitigating his Sixth Amendment claims.

Wilson claims one additional constitutional injury resulting from his detention. That injury stems from violation of a Fifth and Fourteenth Amendment right, the privilege against self-incrimination. Wilson alleges that the prolonged detention enabled the defendant police officers to obtain incriminating written and oral statements from him, statements which the People of the State of Illinois used against him in his first trial for the murders of Officers Fahey and O'Brien.

The City and Brzeczek argue that the Illinois Supreme Court redressed whatever injury Wilson suffered as a result of this violation of his rights by overturning Wilson's conviction, and by preventing the People from using the confession in a second trial. See *Wilson*, 116 Ill.2d at 41–42, 106 Ill.Dec. 771, 506 N.E.2d 571. These defendants have too narrow a view of the interests which the privilege against self-incrimination protects. Classically, the privilege served to prevent evidence which was deemed unreliable from infecting the judicial process. See, for example, *Brown v. Mississippi*, 297 U.S. 278, 285–87, 56 S.Ct. 461, 464–66, 80 L.Ed. 682 (1936). More recent discussions of the privilege, particularly as it has developed in the jurisprudence of the Fifth Amendment, reflect a policy of deterring the official coercion often employed in gathering such evidence. See *Watts v. Indiana*, 338 U.S. 49, 53–55, 69 S.Ct. 1357, 93 L.Ed. 1801 (1949); *Rochin v. California*, 342 U.S. 165, 172–74, 72 S.Ct. 205, 209–11, 96 L.Ed. 183 (1952); *Spano v. New York*, 360 U.S. 315, 320–21, 79 S.Ct. 1202, 1205–06, 3 L.Ed.2d 1265 (1959); *Miranda v. Arizona*, 384 U.S. 436, 458–66, 86 S.Ct. 1602, 1619–24, 16 L.Ed.2d 694 (1966); *Andresen v. Maryland*, 427 U.S. 463, 476 n. 8, 96 S.Ct. 2737, 2746, n. 8, 49 L.Ed.2d 627 (1976).

**384**

The Illinois Supreme Court's decision in *Wilson* unquestionably did all that could have been done to protect the judicial system from Wilson's unreliable confession. Its decision to exclude the confession also will serve to deter future incidents of police misconduct. See *Mapp v. Ohio*, 367 U.S. 643, 655–57, 81 S.Ct. 1684, 1691–93, 6 L.Ed. 2d 1081 (1961) (exclusion of illegally obtained evidence compels respect for constitutional guarantees); *United States v. Leon*, 468 U.S. 897, 906, 104 S.Ct. 3405, 3411, 82 L.Ed.2d 677 (1984) (exclusionary rule deters future illegality). The exclusion did not compensate Wilson, however, for having to incriminate himself, having the People use that evidence against him, and having to prosecute an appeal to get that evidence barred. See *id.* (exclusionary rule does not remedy violation itself, but rather is a prospective form of relief). The Illinois court's ultimate decision cannot be said to have fully vindicated the interests which the Fifth Amendment protects. Wilson thus may seek redress from the City for injuries stemming from his giving an incriminating statement if the People obtained the statement pursuant to a City policy of illegally prolonged detention. See *Duncan v. Nelson*, 466 F.2d 939, 942–45 (7th Cir.1972) (person may recover damages under § 1983 for injuries suffered as a result of unlawful interrogation and confession); *Hensley v. Carey*, 818 F.2d 646, 650 n. 4 (7th Cir.1987) (same conclusion).

Wilson claims that yet another illegal policy existed. He contends that

there existed in February 1982 in the City of Chicago a de facto policy, practice and/or custom of Chicago Police Officers exacting unconstitutional revenge and punishment against persons who they alleged had injured or killed a fellow officer. This revenge and punishment included beating, kicking, torturing, shooting, and/or executing such a person, both for the purpose of inflicting pain, injury and punishment on that person, and also for the purpose of forcing that person to make an inculpatory statement.

Complaint, Count 3.

■ The City and Brzeczek submit that Wilson has not offered enough evidence as to this alleged policy to avoid summary judgment. This court disagrees. As noted above, there is evidence that Brzeczek, who was Superintendent of Police, could have been involved with Wilson's alleged beating. Such involvement by a high-ranking department official can result in municipal liability. See *City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 923, 99 L.Ed.2d 107 (1988); *Pembaur v. Cincinnati*, 475 U.S. 469, 479–81, 106 S.Ct. 1292, 1298–99, 89 L.Ed.2d 452 (1986). Moreover, Wilson has introduced evidence that the Chicago Police were extremely angry following the shootings of Officers Fahey and O'Brien.

■ In the course of a manhunt for the killers, police officers allegedly beat Roger Harris, who the officers said looked like "those 'niggers' that shot the two officers." See Plaintiff's Statement in Opposition to City's Motion, App. G. Officers also allegedly entered the home of Frances Pinex. Frances's son Alfonzo came down to see what was going on, at which time the police grabbed him, slammed him against the wall, and hit him with a flashlight. Later, another officer allegedly struck him with a pistol. The officers questioned Alfonzo with respect to the murders of the officers, as someone had informed police that Alfonzo was involved. Alfonzo was taken away, thrown into a police car, and had his leg allegedly slammed by the car's door. See *id.* A third incident prior to the arrest of Wilson allegedly occurred when police took Larry Milan in for questioning relating to the killings. Milan was allegedly beaten, kicked, and slapped. See *id.*

The court concludes from the actions alleged in these three cases, later news reports of police misconduct during this period, and the City's failure to produce records relating to these and other complained-of incidents, that Wilson can establish that City officials could have been recklessly indifferent to police abuse of persons suspected of injuring or killing police officers. Such indifference, if proven, can indicate a municipal policy or practice. See *Jones v. City of Chicago*, 856 F.2d 985,

992–93 (7th Cir.1988). Whether such a policy, practice, or reckless indifference to such policies or practices existed at levels sufficient to impute liability to the City is for the jury to decide.

*Individual Defendants—Counts 1 and 2*

■ The court next turns to the motions of Thomas McKenna and Patrick O'Hara for summary judgment as to the activities alleged in Wilson's Count 1. McKenna and O'Hara contend that Wilson has introduced no evidence of personal involvement in the beating of Wilson. This court disagrees. Wilson has offered evidence that McKenna and O'Hara were present when Jon Burge mistreated Wilson at the site of Wilson's arrest. Wilson has introduced other evidence that McKenna and O'Hara were at Area 2 headquarters when he was tortured there. Although Wilson has not named McKenna and O'Hara as the persons who beat him, the jury could reasonably impute liability to McKenna and O'Hara, as police officers are under a constitutional duty to protect persons who are in custody from beatings from fellow officers if they are aware of such beatings. See *Byrd v. Brishke,* 466 F.2d 6, 11 (7th Cir.1972); *Ellsworth v. City of Racine,* 774 F.2d 182, 185 (7th Cir.1985); *Rascon,* 803 F.2d at 276; *Archie v. City of Racine,* 847 F.2d 1211, 1222–23 (7th Cir. 1988) (en banc). Wilson has submitted enough evidence to suggest that McKenna and O'Hara knew that other officers were beating Wilson, but that they chose not to prevent further beatings. McKenna and O'Hara thus are not entitled to summary judgment on Count 1.

■ All of the individual defendants contend next that Wilson has not introduced enough evidence showing that there was a conspiracy to deny him his constitutional rights, as Wilson alleges in Count 2. Both sides rely on *Hampton v. Hanrahan,* 600 F.2d 600 (7th Cir.1979), rev'd in part on other grounds, 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980), in supporting their contentions. In *Hampton* the court defined a civil conspiracy as " 'a combination of two or more persons acting in concert to commit an unlawful act, ... the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and "an overt act that results in damages." ' " *Id.* at 621 (citations omitted). "Circumstantial evidence may provide adequate proof of conspiracy," according to the court in *Hoffman–La-Roche, Inc. v. Greenberg,* 447 F.2d 872, 875 (7th Cir.1971). The court in *Hampton* held further that

> the question of whether an agreement exists should not be taken from the jury in a civil conspiracy case so long as there is a possibility that the jury can "infer from the circumstances [that the alleged conspirators] had a 'meeting of the minds' and thus reached an understanding" to achieve the conspiracy's objectives.

*Hampton,* 600 F.2d at 621 (citations omitted; insertion in original).

Wilson has introduced evidence that raises the possibility that a jury could infer that the defendants' minds met and that they understood the objectives of a conspiracy among them. Commander Burge told his fellow officers at the arrest scene that they were not to harm Wilson on the way to the station, as they would "get" Wilson there. As noted earlier, Wilson has introduced evidence that once he arrived at the station and was tortured, none of the defendants sought to prevent further injury to him. Instead, they may have allowed beatings to continue until they obtained a confession from him. Later the officers testified against Wilson at a suppression hearing and at his first trial for murder, where they denied any wrongdoing in obtaining Wilson's confession. Nevertheless, the Illinois Supreme Court rejected the near-unanimous testimony of these officers in finding that the State of Illinois could not establish by clear and convincing evidence that Wilson's confession was not obtained without coercion.

Such evidence raises the possibility that a conspiracy existed among these defendants, as well as three persons who are not

defendants.[3] This court thus must allow Wilson to present his case to the jury. Who actually was in the conspiracy, if one existed, its aims, and its extent are for the jury to decide.

### Offensive Collateral Estoppel

■ The final motion is one by Wilson for summary judgment on certain issues decided in *Wilson.* Wilson contends that the defendants in this case should be estopped from relitigating the issues of his condition prior to his arrest, the time that he received his injuries after his arrest, and whether a statement which he gave was the product of coercion. This court canvassed the pertinent law above, and finds that there are three reasons why these defendants can litigate these issues in this case. First, Wilson cannot show that the defendants were parties or privies to parties in *Wilson.* The defendants were not the "parties" to *Wilson,* as the parties were Wilson and the People of the State of Illinois. The defendants also were not privy to parties in the first action, under Illinois' narrow view of privity. See *Simcox v. Simcox,* 175 Ill.App.3d 473, 476, 124 Ill.Dec. 915, 917, 529 N.E.2d 1032, 1034 (1988) ("Privity contemplates a mutual or successive relationship to the same property rights which were the subject matter of prior litigation.").

Wilson argues that Illinois' party-or-privity rule is broader than the court believes. Wilson submits that Illinois gives collateral estoppel effect to issues raised in proceedings against parties who were "adversaries in fact" in an earlier action. This may be so, but the cases which Wilson cites all are in keeping with this court's reading of Illinois law. See *Stangle v. Chicago, Rock Island and Pacific Railroad Co.,* 295 F.2d 789 (7th Cir.1961) (court prevented co-defendant in prior proceeding from raising issue found against other defendant in that

proceeding in a second proceeding; party who was collaterally estopped was a party in the first proceeding); *Jones v. Koepke,* 387 Ill. 97, 55 N.E.2d 154 (1944) (court refused to estop person who was the son of a defendant in a prior case).

Wilson's claim of collateral estoppel also falls because the Illinois Supreme Court did not decide the issues in *Wilson* in the manner which Wilson suggests. The court actually held that the People were unable to establish by clear and convincing evidence that they did not obtain Wilson's confession by coercion. See *Wilson,* 116 Ill.2d at 41–42, 106 Ill.Dec. 771, 506 N.E.2d 571. The court did not state, however, that the People could not prove this contention by a preponderance of the evidence—the standard that Wilson will have to meet in this present action. Wilson thus cannot fulfill *YMCA*'s requirement that the same question be determined in both causes of action. See *YMCA,* 101 Ill.2d at 246, 78 Ill.Dec. 125, 461 N.E.2d 959.

■ A third reason for not allowing Wilson to estop the defendants because of *Wilson* is that such a decision would not comport with due process. The "full and fair opportunity to litigate" requirement of due process carries with it its own notion of privity, one announced in *Montana:* the prior litigation must have been done for the benefit and at the direction of a person who is alleged to be privy. The *Montana* court used the word "benefit" in the sense of a "direct financial or proprietary interest...." *Montana,* 440 U.S. at 154, 99 S.Ct. at 974.

Wilson asserts that the People of the State of Illinois prosecuted him for murder in part for the benefit of these defendants. He asserts further that they had a stake in the murder trial, that they assisted the State in its prosecution, and that they had an interest in avoiding Wilson's acquittal.

---

3. The individual defendants have asked this court to strike the names of these persons from the First Amended Complaint any time Wilson calls them "defendants" or "unsued co-conspirators." While the court has reservations as to the individual defendants' power to make motions on behalf of persons not parties to this action, absent a showing of prejudice to the individuals

who are parties, this court will order Wilson to strike any reference to persons not served or sued in this action that characterizes that person as a defendant or an "unsued co-conspirator." Wilson may introduce evidence, however, that persons who are not defendants in this case were part of the alleged conspiracy.

As meaningful as these interests may have been to the defendants, they are not sufficient enough for purposes of due process. The People of the State of Illinois, and not these defendants, ultimately controlled the prosecution of Wilson. That much is evident from the proceedings in *Wilson*, where the People conceded that the defendants had beaten Wilson, but that his confession nevertheless could be used against him. If the defendants had as much control over Wilson's prosecution as Wilson alleges, it would have been preposterous for them to allow the People to make this concession.

Moreover, the defendants' stake in Wilson's conviction is not as great as Wilson makes out. While an acquittal would have saddened or angered them, it would not have lead inexorably to punishment for them. Indeed, Wilson himself has submitted facts that once the Illinois Supreme Court threw out the tainted confession, the defendants never received punishment.

This court thus denies Brzeczek's motion for summary judgment on the issue of his individual liability. The court further denies Brzeczek and the City of Chicago's motions for summary judgment on Count 3 of Wilson's First Amended Complaint. The court denies the defendants' motions for summary judgment on Counts 1–2 of the First Amended Complaint, and Wilson's motion for summary judgment. The court orders Wilson to strike any description of Lawrence Hyman, Mario Ferro, or Mulvaney as a defendant or unsued co-conspirator from the First Amended Complaint.