**Paul HICKOMBOTTOM, Plaintiff,**

v.

**CITY OF CHICAGO, Robert McGuire, Thomas Tansey, James Kierse, William Murphy, and James O'Connell, Defendants.**

**No. 89 C 1452.**

United States District Court, N.D. Illinois, E.D.

May 18, 1990.

---

Paul Hickombottom, pro se.

Diane Pezanoski, John F. McGuire, City of Chicago Dept. of Law, Kelly R. Welsh, Corp. Counsel, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

The City of Chicago and five of its police officers, Robert McGuire, Thomas Tansey, James Kierse, William Murphy, and James O'Connell, have moved to dismiss many portions of the complaint filed by Paul Hickombottom, an inmate at the Menard Correctional Center. Since Hickombottom is proceeding pro se, this court may dismiss his claims "only ... if it is beyond doubt that there is no set of facts under which he could obtain relief." *Shango v. Jurich,* 681 F.2d 1091, 1103 (7th Cir.1982). With this in mind, the court will turn to Hickombottom's factual allegations, which the court must accept as true for purposes of the present motion.

On March 1, 1986, Hickombottom was at his apartment at 6565 S. Yale Avenue in Chicago, Illinois. Hickombottom had lived at this address for six months, and had leased the apartment with his brother Antonio. At approximately 3 a.m., Hickombottom left the apartment in the company of his girlfriend, Renee Williams—a woman who did not live at the apartment—and Arthur Wyatt. Unbeknownst to the three, Chicago Police Detectives (including the officers named in Hickombottom's complaint) had jointly set up surveillance around the apartment, and were waiting for Hickombottom. They were acting on a tip from someone whom they had arrested "well in advance" for a shooting. The tipster told the police that the gun used in the crime was in Hickombottom's apartment. Nevertheless, the police did not obtain a search warrant. Instead, they allegedly conspired to gather evidence which would implicate Hickombottom in the shooting.

As Hickombottom approached a car which was waiting outside of his flat, officers stopped and arrested him. The officers did not have an arrest warrant. Detective Kierse ordered Hickombottom to lie face down. After Hickombottom did so, officers handcuffed him and searched his person. Kierse then kicked Hickombottom in the stomach and back, telling him that if he lifted his head, officers would "blow his head off."

The search of Hickombottom's person turned up keys to the apartment. Detective Tansey took the keys, while Detective

McGuire asked Hickombottom where "the gun" was. Hickombottom replied that he did not have a gun. McGuire and Tansey then asked him who was in the apartment. Renee Williams answered that her two children and Antonio Hickombottom were there. McGuire and Tansey ordered Wyatt to accompany them to Hickombottom's apartment. McGuire returned a short time later to the patrol car where Hickombottom and Williams were waiting. McGuire reported that the children were crying, and that no one would open the door of the apartment. He told Williams to come with him and to let them into the apartment to look for "the gun."

Williams obeyed, and went to the apartment. She allowed the officers to come in, and eventually McGuire found a gun. Officers then took Hickombottom to Area I headquarters for questioning. McGuire, Tansey, and an assistant State's Attorney interrogated Hickombottom in four shifts, lasting from 3:30 a.m. until 1:20 p.m. During questioning, Hickombottom repeatedly denied any involvement in the shooting which the police were investigating. McGuire and Tansey told Hickombottom that someone else whom they had arrested for the shooting had led them to Hickombottom, and had told them "everything." They warned Hickombottom that he should talk, or else they would make good on a variety of threats. The threats included taking his children away from him, or charging him or Williams with the crime. They also withheld food and water from Hickombottom and prevented him from sleeping. They assured Hickombottom that they knew he had not pulled the trigger, but they needed a statement, and they promised not to charge him if he gave them one. Yielding to these pressures, Hickombottom gave a statement.

Apparently the evidence which the detectives had against Hickombottom was not enough. In order to get more, the police allegedly waited 72 hours after Hickombot-

tom's arrest before presenting him to a judge for a hearing on probable cause. At his trial, the prosecution introduced the gun found in Hickombottom's apartment into evidence. Hickombottom's complaint does not say if his statement found its way into evidence too.

Hickombottom filed a four-count complaint in this court, charging the defendants with violating his civil rights. In Count 1, Hickombottom accuses the defendants of violating his rights under the Fourth and Fourteenth Amendments to the Constitution[1] in surveying his apartment, arresting him without a warrant, searching his person, and searching his apartment without a warrant. Hickombottom brings this count pursuant to 42 U.S.C. § 1983 (1982). In Count 2, Hickombottom alleges that the defendants entered into a conspiracy which is illegal under Illinois law. In Count 3, another claim brought under § 1983, Hickombottom contends that the defendants denied him his right to due process under the Fourteenth Amendment by beating him, abusively interrogating him, and prolonging his detention. In Count 4, Hickombottom claims that the City of Chicago is responsible for the actions of its police officers. He alleges that the City "has known of the abusive tactics and policies of the Chicago Police Department and its personnel and has failed to curb and[/]or act on the police department[']s illegal policies." Complaint par. 67. In each of his counts, Hickombottom claims to sue the detectives in their official and individual capacities. He seeks a declaration that the defendants' acts were unlawful, and an injunction that would prevent the defendants from retaliating against him, and compensatory and punitive damages.

The defendants have moved to dismiss most of Hickombottom's claims under Rule 12(b)(6), Fed.R.Civ.Pro. They concede that Hickombottom has stated a claim against Detective Kierse for excessive force in arrest, in violation of the Fourth Amend-

---

**1.** Hickombottom alleges a claim in Count 1 under the Fourteenth Amendment insofar as it applies the Fourth Amendment to the several

ment.[2] They also acknowledge that he has stated a claim in Count 3 against Detectives McGuire and Tansey for denial of due process under the Fourteenth Amendment, in that McGuire and Tansey allegedly denied him food and water for an unreasonable length of time while he was in their custody. The defendants' recognition of Hickombottom's claims ends here. The court will thus turn to their specific arguments, beginning with two general objections to Hickombottom's complaint.

The City of Chicago first contends that Hickombottom has not stated a claim against it, either directly or as a result of his pleading against the detectives in their official capacity, in Counts 1, 3, and 4. See *Wolf–Lillie v. Sonquist*, 699 F.2d 864, 870 (7th Cir.1983) (suit against officer in his or her official capacity is suit against government entity itself). A plaintiff may sue a municipality under § 1983 only if the plaintiff can allege that the municipality deprived the plaintiff of his or her federal rights pursuant to an official policy or custom. See *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690, 98 S.Ct. 2018, 2035, 56 L.Ed.2d 611 (1978). A plaintiff alleges such a policy or custom usually in one of two ways. One is by showing that the deprivation stemmed from the action or decision of a person responsible for making municipal policy. See *Pembauer v. Cincinnati*, 475 U.S. 469, 479–81, 106 S.Ct. 1292, 1298–99, 89 L.Ed.2d 452 (1986); *Wilson v. City of Chicago*, 707 F.Supp. 379, 384 (N.D.Ill.1989). The other is by demonstrating a pattern of conduct or a series of acts from which a reasonable person could infer the existence of a policy or custom. See *Strauss v. City of Chicago*, 760 F.2d 765, 768–770 (7th Cir.1985); *Wilson v. City of Chicago*, 684 F.Supp. 982, 985 (N.D.Ill.1988) (*"Wilson I"*).

Hickombottom tries to employ both of these methods of alleging the City's

responsibility for the acts of its police officers. Neither attempt succeeds. First, Hickombottom has alleged no fact from which the court could infer that Detectives McGuire, Tansey, Kierse, Murphy, or O'Connell set policy for the City of Chicago on arrests, searches, treatment of arrestees, interrogations, or detentions. Second, Hickombottom has not alleged specific acts of misconduct occurring prior to March 1, 1986, or identified which City official was or should have been aware of these incidents but did nothing to halt them. While Hickombottom need not allege the officers' authority to make policy or the prior acts of misconduct in detail, mere "boilerplate" assertions of authority or official tolerance of misconduct are not sufficient for pleading municipal liability. See *Strauss*, 760 F.2d at 767–70; *Wilson I*, 684 F.Supp. at 985.

The court thus must dismiss Hickombottom's claims against the City in Counts 1, 3, and 4. This would leave only Count 2, Hickombottom's state law count, against the City. Hickombottom may maintain this claim against the City in this court only if this court chooses to exercise "pendent party jurisdiction" over The City. As this court held in *Valliere v. Kaplan*, 694 F.Supp. 517, 519–21 (N.D.Ill.1988), it is the "exception, not the rule," for the federal courts to exercise such jurisdiction when the plaintiff has not stated a claim against the municipality under § 1983. Like *Valliere*, this case involves the difficult question of whether a municipality owes a duty under Illinois law to a citizen or arrestee to prevent its officers from abusing them. This duty is ill-defined; it is better for the state courts to determine its parameters. Defending against the claim in this court would add to the defendants' burdens in this case, and would perhaps require separate counsel for the City. By contrast, Hickombottom has not demonstrated how

---

States. Hereafter, the court will refer to these claims as only "Fourth Amendment" claims.

**2.** In Count 3 of his complaint, Hickombottom claims that Kierse violated his right to due process under the Fourteenth Amendment for using excessive force. Since Kierse kicked Hickom-

bottom while arresting him, the Fourth Amendment will govern the outcome of Hickombottom's excessive force claim. See *Wilkins v. May*, 872 F.2d 190, 192–93 (7th Cir.1989); *Jones v. County of DuPage*, 700 F.Supp. 965, 967 (N.D. Ill.1988).

it would be more efficient to try his claim against the City in this court. The court will thus follow *Valliere*, and decline to exercise pendent party jurisdiction over the City.

■ The defendants' other general objection to Hickombottom's complaint is that Hickombottom lacks standing for declaratory or injunctive relief. A plaintiff who seeks injunctive or declaratory relief "must show that he is in immediate danger of sustaining some direct injury" from the defendants. A plaintiff who has suffered from previous misconduct is left to damages relief only, absent a showing that he or she will be wronged again. This limitation, which stems from Article III's case and controversy requirement, has the salutary effect of maintaining "the proper balance between state and federal spheres of authority" in the administration of state criminal laws. See *Robinson v. City of Chicago*, 868 F.2d 959, 966–67 & n. 5 (7th Cir.1989).

Hickombottom has not alleged that he is in immediate danger of suffering from another illegal arrest, search, or pre-trial detention. He also has not alleged that he has received threats of retaliation from these defendants for filing this lawsuit. All that Hickombottom alleges is injury from past misconduct, which the court can remedy with damages. The court will thus dismiss Hickombottom's requests for injunctive and declaratory relief.

■ The court will now focus on each of Hickombottom's claims, beginning with those brought under § 1983. Hickombottom first alleges that the defendants' surveillance of his apartment violated the Fourth Amendment. The preliminary question is whether this amendment restricted the defendants' activities at all. The Court in *Smith v. Maryland*, 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979), divided this inquiry into two questions: first, "whether the individual, by his conduct, has 'exhibited an actual (subjective) expectation of privacy,'" and second, "whether the individual's subjective expectation of privacy is 'one that society is prepared to recognize as "reasonable."'"

*Id.* at 740, 99 S.Ct. at 2580, quoting *Katz v. United States*, 389 U.S. 347, 351, 361, 88 S.Ct. 507, 511, 516, 19 L.Ed.2d 576 (Harlan, concurring).

Hickombottom has not pleaded anything which would indicate that he had a subjective expectation of privacy in his comings and goings from his apartment. Even if Hickombottom had such an expectation, it would not be one which society is prepared to recognize as reasonable. Hickombottom has not pleaded facts which would indicate that the 6500 block of S. Yale Avenue is anything other than a usual city block on a usual city street. Anyone walking down such a street, or sitting in a car parked on such a street, would have been able to observe the traffic in and out of Hickombottom's apartment building. Police officers may observe those activities which the public is free to watch without fearing transgression of the Fourth Amendment. See *United States v. Knotts*, 460 U.S. 276, 282, 103 S.Ct. 1081, 1085, 75 L.Ed.2d 55 (1983) (no expectation of privacy in traffic to and from public highway, or in movement of things from "open fields" into and out of private home).

■ Hickombottom next alleges that the defendants violated his rights under Fourth Amendment by arresting him without a warrant. While the Supreme Court has expressed a preference for arrest warrants when, as Hickombottom alleges here, it is feasible for police officers to obtain one in advance of arrest, the Court has never invalidated an arrest solely for lack of a warrant. See *Gerstein v. Pugh*, 420 U.S. 103, 113, 95 S.Ct. 854, 862, 43 L.Ed.2d 54 (1975). Rather, an arrest violates the Fourth Amendment only if it is "unreasonable." Hickombottom has not alleged any facts which would indicate that his arrest was unreasonable. He pleads, for example, that the defendants "had reason to believe Hickombottom was involved in a crime." Complaint at par. 59(1). This suggests that the defendants had probable cause to arrest Hickombottom, one of the Fourth Amendment's essential requirements for an arrest. See *Papachristou v. City of Jacksonville*, 405 U.S. 156, 169, 92

S.Ct. 839, 847, 31 L.Ed.2d 110 (1972). Since the arrest took place in public, probable cause was all that the defendants needed before effecting the arrest. See *United States v. Fernandez–Guzman,* 577 F.2d 1093, 1097 (7th Cir.1978). There also is no suggestion that the defendants arrested Hickombottom solely as a pretext to search his person. See *Amador–Gonzalez v. United States,* 391 F.2d 308, 314 (5th Cir. 1968).

Hickombottom thus has not alleged sufficient facts which would indicate that the defendants violated the Fourth Amendment in arresting him. He next alleges in Count 1 that the warrantless search of his person, which was incidental to his arrest, as well as the taking of his apartment keys violated the Fourth Amendment. It is well-accepted, however, that "[u]nder the Fourth and Fourteenth Amendments, an arresting officer may, without a warrant, search a person validly arrested." *Michigan v. De-Fillippo,* 443 U.S. 31, 35, 99 S.Ct. 2627, 2631, 61 L.Ed.2d 343 (1979). Since it appears that the defendants validly arrested Hickombottom, the court holds that their subsequent search of his person did not violate the Fourth Amendment.

█ The legality of the seizure of Hickombottom's keys presents thornier, but readily resolved, issues. The court begins again with the language of the Fourth Amendment: a seizure violates it only if the seizure is "unreasonable." It is not unreasonable for officers to take personal property which is in the possession of an arrestee when the arrest occurs outside of a home. Searches of an arrestee can reveal weapons, means of escape, and evidence of a crime, which authorities may seize immediately, see *United States v. Edwards,* 415 U.S. 800, 802–03, 94 S.Ct. 1234, 1236–37, 39 L.Ed.2d 771 (1974); that officers do not immediately recognize the evidentiary or threatening nature of an item will not invalidate their seizure of it. See *United States v. Robinson,* 414 U.S. 218, 235, 94 S.Ct. 467, 476, 38 L.Ed.2d 427 (1973); *U.S. v. Holzman,* 871 F.2d 1496, 1504–05 (9th Cir.1989); *United States v. McFarland,* 633 F.2d 427, 429 (5th Cir.

Unit A 1980) (per curiam). The Supreme Court's decisions involving searches and seizures incident to arrest indicate a preference for bright-line rules, rather than case-by-case weighing of probable cause for search or seizure. See also *United States v. Griffith,* 537 F.2d 900, 905 (7th Cir.1976) (suggesting such a rule in this context, one permitting seizure of personal effects in arrestee's custody when arrest takes place outside of home). This court believes that in light of this preference, the defendants' seizure of Hickombottom's keys was not unreasonable under the facts alleged. Hickombottom's most meritorious allegation in Count 1 is that the defendants searched his home without a warrant, in violation of the Fourth Amendment. "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York,* 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980) (footnote omitted). Nevertheless, police officers may search private property without a warrant or even probable cause upon voluntary consent, properly given. Police can rely on consent not only from the defendant, but also from "a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock,* 415 U.S. 164, 165–66, 171, 94 S.Ct. 988, 990–91, 993, 39 L.Ed.2d 242 (1974).

█ The issue which Hickombottom is trying to put before this court is whether the defendants properly could have relied on Renee Williams's consent in searching Hickombottom's apartment. The issue is an unsettling one, given the present posture of this case. Hickombottom does not state in his complaint why he is imprisoned at Menard. Assuredly, he did not have to provide this information at this time—it is irrelevant to his claims. Nevertheless, if Hickombottom is serving a sentence on the conviction which resulted from the events discussed in his complaint, the court should dismiss those aspects of the complaint which indirectly attack the legality of Hickombottom's confinement. The court could not entertain these claims until Hickombot-

tom had exhausted his remedies under 28 U.S.C. § 2254 (1982). See *Preiser v. Rodriguez*, 411 U.S. 475, 499, 93 S.Ct. 1827, 1841, 36 L.Ed.2d 439 (1973); *Hanson v. Heckel*, 791 F.2d 93, 95 (7th Cir.1986); *Greene v. Meese*, 875 F.2d 639, 641–42 (7th Cir.1989).

Because defendants Kierse, McGuire, and Tansey have admitted that Hickombottom has stated claims against them, this case will have to proceed at least as far as summary judgment. Since it is possible that Hickombottom's claim for an unconstitutional search of his apartment could be an indirect attack on his present confinement (Hickombottom alleges that the search yielded evidence which the state used against him in a criminal trial), the court believes it is prudent to reserve decision on whether Hickombottom has stated such a claim until it is clear that he is not attempting to circumvent federal habeas procedures. See Rule 12(d) (allowing court to defer ruling on motion to dismiss until as late as trial). The court will also reserve decision on the defendants' contention that they are entitled to qualified immunity on this claim. The court will dismiss Hickombottom's remaining claims in Count 1.

 The court now turns to Hickombottom's other federal claims, which are in Count 3. The defendants contest only two aspects of Count 3. They first argue that Hickombottom has not stated a claim for denial of due process in their interrogation of him. The court agrees. The Fourteenth Amendment's Due Process Clause does not require the states to provide process or refrain from certain acts for the sake of process or restraint only. Rather, as a general rule, the states need provide due process only before depriving a person of life, liberty, or property. Before one can speak of a denial of due process, one must point to a deprivation.

Construing Hickombottom's complaint liberally, the court is safe in noting that Hickombottom does not allege a deprivation of his life or property on account of the defendants' interrogation of him. He may be arguing a restraint on his liberty, but it is unclear what liberty in particular. The defendants acted properly in curtailing his liberty to leave Area I (setting the length of his detention aside for the moment), as Hickombottom makes no assertion that they lacked probable cause to believe he had committed a crime. The court must presume that they acted properly in asking him questions about that crime, for the Due Process Clause does not limit interrogations in themselves. The Due Process Clause of the Fourteenth Amendment incorporates the Fifth Amendment's protections against self-incrimination, which in turn limit police from obtaining certain incriminating confessions, see *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), but Hickombottom has not alleged that the defendants obtained a statement that was used to incriminate him.[3]

 Hickombottom thus has not stated a claim of denial of due process in his interrogation. The defendants next argue that Hickombottom has not stated a claim for denial of due process in their failure to bring Hickombottom promptly before a magistrate or judge following his arrest. Although Hickombottom frames his claim in terms of a denial of due process, he really asserts a denial of his Fourth Amendment rights. See *Gerstein*, 420 U.S. at 114, 95 S.Ct. at 863 ("the Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest"); *Jones v. County of DuPage*, 700 F.Supp. 965, 969 (N.D.Ill.1988). The defendants do not contest Hickombottom's right to have been brought promptly before a judicial officer, but they do challenge whether he suffered injury on ac-

**3.** In his brief in opposition to the defendants' motion Hickombottom asserts that they extracted a confession which was used against him. If this is true, Hickombottom should plead it, but if he is in prison as a result of this confession, this court would not have the power to consider this claim any further until Hickombottom has exhausted his federal habeas remedies. See discussion at page 12 above.

count of their alleged denial of this right. A plaintiff who seeks to recover under § 1983 must demonstrate injury, in order to satisfy Article III's case or controversy and standing requirements. Abstract injuries are not enough. See *Los Angeles v. Lyons,* 461 U.S. 95, 101–02, 103 S.Ct. 1660, 1664–65, 75 L.Ed.2d 675 (1983).

Hickombottom does not allege that had he been brought before a judicial officer, he would have been released sooner. See *Gramenos v. Jewel Companies, Inc.,* 797 F.2d 432 (7th Cir.1986) (falsely arrested plaintiff may recover for prolonged detention under § 1983); *Llaguno v. Mingey,* 763 F.2d 1560 (7th Cir.1985) (same); *Moore v. Marketplace Restaurant, Inc.,* 754 F.2d 1336, 1350–51 (7th Cir.1985) (same). Nor does he allege that he would have avoided other injuries on account of a judicial officer's review of his case. See *Jones,* 700 F.Supp. at 968–69 (wife of arrestee who committed suicide prior to being brought before judicial officer could sue county officials under § 1983 where earlier release could have prevented suicide). From what has been alleged, it appears that the defendants had probable cause to arrest and hold Hickombottom. Even if he had been brought before a judicial officer, Hickombottom apparently would be in the same position he is in today. The court thus must dismiss Hickombottom's claim for unconstitutionally prolonged detention.

This brings the court to Hickombottom's state law claims in Count 2. There Hickombottom alleges that the defendants engaged in a civil conspiracy which is illegal under Illinois law. "[T]he gist of a civil action based upon a conspiracy is not the conspiracy or combination in itself, but rather the overt acts committed in pursuance of the conspiracy. In other words, in order to render a conspiracy actionable, the conspiracy must be followed by a wrongful overt act in furtherance thereof." *Commercial Products Corp. v. Briegel,* 101 Ill.App.2d 156, 164, 242 N.E.2d 317, 321 (1968) (citations omitted). See also *Maimon v. Sisters of the Third Order,* 142 Ill. App.3d 306, 311, 96 Ill.Dec. 500, 504–05, 491 N.E.2d 779, 783–84 (1986). Hickombottom alleges that there were four wrongs committed against him: (1) his arrest, (2) the taking of his keys, (3) the entry into his apartment without his permission, and (4) the search of that apartment. Hickombottom claims that these acts violated both federal and Illinois law. While the court has determined already that (1) and (2) did not violate federal law, the court is reserving decision on (3) and (4); until the court makes that decision, the court will not rule whether Hickombottom has alleged a wrongful overt act.

The defendants' remaining objection to Count 2 is that Hickombottom fails to allege the existence of a conspiracy. All that is necessary in federal court for pleading the existence of a conspiracy is an allegation that two or more persons combined to accomplish by concerted action certain purposes, whether lawful or unlawful. See *DeValk Lincoln Mercury, Inc. v. Ford Motor Co.,* 550 F.Supp. 1199, 1203 (N.D.Ill.1982). Hickombottom alleges in 57–58 of his complaint that the defendants "all acting in concert reached a tacit or overt meeting of the minds" to deprive Hickombottom of his rights, and jointly took many of the acts discussed in this opinion. Hickombottom thus has alleged the existence of a conspiracy.

For the reasons given in this opinion, the court dismisses all of Hickombottom's claims against the City of Chicago under Rules 12(b)(6) and 12(h)(3). The court dismisses his claims of unconstitutional surveillance, arrest, and search of his person in Count 1, and his claims of unconstitutional interrogation and prolonged detention in Count 3, against the remaining defendants under Rule 12(b)(6). The court appoints Hickombottom counsel to assist him with his remaining claims.